**CREDIT AND SECURITY AGREEMENT**

between

**BRANDYWINE HEALTH SERVICES OF MISSISSIPPI, INC.
dba CHOCTAW COUNTY MEDICAL CENTER**

**as Borrower**

**and**

**NORTHERN HEALTHCARE CAPITAL, LLC**

**as Lender**

**Dated as of
January 1, 2007**



# CREDIT AND SECURITY AGREEMENT

## Table of Contents

Page

I.   DEFINITIONS ........................................................................................................ 1

    1.1   General Terms ................................................................................... 1
    1.2   Specific Terms ................................................................................... 1

II.  ADVANCES, PAYMENT AND INTEREST ................................................. 15

    2.1   Advances ........................................................................................... 15
    2.2   The Notes; Maturity ......................................................................... 16
    2.3   Interest .............................................................................................. 16
    2.4   Revolving Facility Disbursements; Requirement to Deliver Borrowing
        Certificate ......................................................................................... 17
    2.5   Revolving Facility Collections; Repayment; Borrowing Availability  and
        Lockbox ............................................................................................ 17
    2.6   Promise to Pay; Manner of Payment ............................................... 19
    2.7   Repayment of Excess Advances ...................................................... 19
    2.8   Payments by Lender ......................................................................... 20
    2.9   Grant of Security Interest; Collateral .............................................. 20
    2.10  Collateral Administration ................................................................ 21
    2.11  Power of Attorney ............................................................................ 22

III. FEES AND OTHER CHARGES .................................................................... 23

    3.1   Facility Fee ....................................................................................... 23
    3.2   [Intentionally Omitted] .................................................................... 23
    3.3   Collateral Management Fee .............................................................. 23
    3.4   Early Termination Fees .................................................................... 23
    3.5   [Intentionally Omitted] .................................................................... 23
    3.6   Computation of Fees; Lawful Limits .............................................. 23
    3.7   Default Rate of Interest ................................................................... 24

IV.  CONDITIONS PRECEDENT ........................................................................ 24

    4.1   Conditions to Initial Advance and Closing ..................................... 24
    4.2   Conditions to Each Advance ............................................................ 27

V.   REPRESENTATIONS AND WARRANTIES ............................................... 28

    5.1   Organization and Authority .............................................................. 28
    5.2   Loan Documents ............................................................................... 28
    5.3   Subsidiaries, Capitalization and Ownership Interests ..................... 29
    5.4   Properties .......................................................................................... 29
    5.5   Other Agreements ............................................................................. 29

i

| | 5.6 | Litigation ................................................................................ 30 |
|---|---|---|
| | 5.7 | Hazardous Materials ................................................................ 30 |
| | 5.8 | Tax Returns, Governmental Reports ....................................... 30 |
| | 5.9 | Financial Statements and Reports ........................................... 30 |
| | 5.10 | Compliance with Law ............................................................ 31 |
| | 5.11 | Intellectual Property .............................................................. 31 |
| | 5.12 | Licenses and Permits; Labor ................................................. 31 |
| | 5.13 | No Default ............................................................................. 32 |
| | 5.14 | Disclosure ............................................................................. 32 |
| | 5.15 | Existing Indebtedness; Investments, Guarantees and Certain Contracts ........... 32 |
| | 5.16 | Agreements with Affiliates .................................................... 32 |
| | 5.17 | Insurance ............................................................................... 33 |
| | 5.18 | Names, Location of Offices, Records and Collateral ............. 33 |
| | 5.19 | Non-Subordination ................................................................ 33 |
| | 5.20 | Accounts ................................................................................ 33 |
| | 5.21 | Healthcare Law Compliance .................................................. 34 |
| | 5.22 | Reliance on Representations; Survival ................................... 34 |

**VI.    AFFIRMATIVE COVENANTS** ................................................................ 34

| | 6.1 | Financial Statements, Reports and Other Information ........................ 35 |
|---|---|---|
| | 6.2 | Payment of Obligation ........................................................... 37 |
| | 6.3 | Conduct of Business and Maintenance of Existence and Assets ........ 37 |
| | 6.4 | Compliance with Legal and Other Obligations ..................... 37 |
| | 6.5 | Insurance ............................................................................... 38 |
| | 6.6 | True Books ............................................................................ 38 |
| | 6.7 | Inspection; Period Audits ...................................................... 38 |
| | 6.8 | Further Assurances; Post Closing .......................................... 39 |
| | 6.9 | Payment of Indebtedness ....................................................... 39 |
| | 6.10 | Lien Terminations ................................................................. 39 |
| | 6.11 | Use of Proceeds .................................................................... 39 |
| | 6.12 | Collateral Documents; Security Interest in Collateral ........... 39 |
| | 6.13 | [Intentionally Omitted] ......................................................... 40 |
| | 6.14 | Taxes and Other Charges ....................................................... 40 |
| | 6.15 | Payroll Agent ........................................................................ 40 |
| | 6.16 | Brokers and Finders .............................................................. 41 |

**VII.    NEGATIVE COVENANTS** ..................................................................... 41

| | 7.1 | Financial Covenants .............................................................. 41 |
|---|---|---|
| | 7.2 | Permitted Indebtedness .......................................................... 41 |
| | 7.3 | Permitted Liens ..................................................................... 42 |
| | 7.4 | Investments, New Facilities or Collateral; Subsidiaries ........ 42 |
| | 7.5 | Dividends; Redemptions ........................................................ 43 |
| | 7.6 | Transactions with Affiliates .................................................. 43 |
| | 7.7 | Charter Documents; Fiscal Year; Dissolution; Use of Proceeds ........ 44 |
| | 7.8 | Asset Sales ............................................................................ 44 |

| 7.9 | Management | 44 |
| 7.10 | Truth of Statements | 44 |
| 7.11 | IRS Form 8821 | 44 |

| VIII. | EVENTS OF DEFAULT | 44 |

| IX. | RIGHTS AND REMEDIES AFTER DEFAULT | 47 |

| 9.1 | Rights and Remedies | 47 |
| 9.2 | Application of Proceeds | 48 |
| 9.3 | Rights of Lender to Appoint Receiver | 49 |
| 9.4 | Rights and Remedies not Exclusive | 49 |

| X. | WAIVERS AND JUDICIAL PROCEEDINGS | 50 |

| 10.1 | Waivers | 50 |
| 10.2 | Delay; No Waiver or Defaults | 50 |
| 10.3 | Jury Waiver | 50 |
| 10.4 | Cooperation in Discovery and Litigation | 51 |

| XI. | EFFECTIVE DATE AND TERMINATION | 51 |

| 11.1 | Effectiveness and Termination | 51 |
| 11.2 | Survival | 52 |

| XII. | MISCELLANEOUS | 52 |

| 12.1 | Governing Law; Jurisdiction; Service of Process; Venue | 52 |
| 12.2 | Successors and Assigns; Participants; New Lenders | 52 |
| 12.3 | Application of Payments | 53 |
| 12.4 | Indemnity | 53 |
| 12.5 | Notice | 54 |
| 12.6 | Severability; Captions; Counterparts; Facsimile Signatures | 54 |
| 12.7 | Expenses | 55 |
| 12.8 | Entire Agreement | 55 |
| 12.9 | Lender Approvals | 56 |
| 12.10 | Confidentiality and Publicity | 56 |
| 12.11 | Release of Lender | 56 |

ANNEX I

Financial Covenants

## CREDIT AND SECURITY AGREEMENT

THIS CREDIT AND SECURITY AGREEMENT (the "Agreement") dated as of January 1, 2007, is entered into between BRANDYWINE HEALTH SERVICES OF MISSISSIPPI, INC., a Mississippi corporation doing business as CHOCTAW COUNTY MEDICAL CENTER, (the "Borrower"), and NORTHERN HEALTHCARE CAPITAL, LLC, a New York limited liability company (the "Lender").

WHEREAS, Borrower has requested that Lender make available to Borrower a revolving credit facility (the "Revolving Facility") in a maximum principal amount at any time outstanding of up to One Million Dollars ($1,000,000) (such amount, together with such increases as may be made pursuant to Section 2.1(d), the "Facility Cap"), the proceeds of which shall be used by Borrower to pay off an existing IRS lien and provide for its working capital needs;

WHEREAS, Borrower has requested Lender make available to Borrower an amount of up to One Hundred Fifty Thousand Dollars ($150,000) pursuant to a Term Promissory Note dated as of the date hereof (the "Term Loan"); and

WHEREAS, Lender is willing to make the Revolving Facility available to Borrower and is willing to fund said Term Note upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which hereby are acknowledged, Borrower and Lender hereby agree as follows:

## 1. DEFINITIONS

### 1.1 General Terms

For purposes of this Agreement, in addition to the definitions above and elsewhere in this Agreement, the terms listed below shall have the meanings set forth. All capitalized terms used which are not specifically defined shall have meanings provided in Article 9 of the UCC to the extent the same are used or defined therein. Unless otherwise specified herein, any agreement or contract referred to herein shall mean such agreement as modified, amended or supplemented from time to time. Unless otherwise specified, as used in the Loan Documents or in any certificate, report, instrument or other document made or delivered pursuant to any of the Loan Documents, all accounting terms not defined elsewhere in this Agreement shall have the meanings given to such terms in and shall be interpreted in accordance with GAAP.

### 1.2 Specific Terms

**"Account Debtor"** shall mean any Person who is obligated under an Account.

**"Accounts"** shall mean all Healthcare Receivables of Borrower, including, without limitation, all monies due or to become due and obligations in any form (whether arising in connection with contracts, contract rights, Instruments, or Chattel Paper) with respect thereto, in each case whether arising out of goods sold or services rendered or from any

other transactions and whether or not earned by performance, now or hereafter in existence, and all documents of title or other documents representing any of the foregoing, and all collateral security and guaranties of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

**"Advance"** shall mean a borrowing under the Revolving Facility. Any amounts paid by Lender on behalf of Borrower or any Guarantor under any Loan Document shall also be an Advance for purposes of the Agreement.

**"Affiliate"** shall mean, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) of any Person described in clause (a) above with respect to such Person, or (c) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the date hereof) of ten percent (10%) or more of any class of the outstanding voting stock, securities or other equity or ownership interests of such Person. For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the administrative management or policies (even without the power to direct or cause the direction of the clinical/medical management or policies), whether through ownership of securities or other interests, by contract or otherwise.

**"Applicable Rate"** shall mean the interest rates applicable from time to time to Advances under the Agreement.

**"Availability"** shall have the meaning assigned to such term in Section 2.1(a).

**"Billing Date"** shall mean the date on which Borrower first submits a duly completed and supported claim or bill to a third party payor for payment and collection of a Healthcare Receivable.

**"Books and Records"** shall mean Borrower's books and records specifically relating to Accounts, including, but not limited to, ledgers, records indicating, summarizing, or evidencing Borrower's Accounts and all computer programs, disc or tape files, printouts, runs, and other computer prepared information with respect to the foregoing and any software necessary to operate the same.

**"Borrowing Base"** shall mean, as of any date of determination, the net collectible value of Eligible Receivables, as determined with reference to the most recent Borrowing Certificate and otherwise in accordance with the Agreement; provided, however, that if as of such date the most recent Borrowing Certificate is of a date more than four (4) Business Days before or after such date, the Borrowing Base shall be determined by Lender in its sole discretion. For purposes hereof, "net collectible value" of Eligible Receivables means the amount that is reasonably expected to be collected with respect to Eligible Receivables from third-party payors within 150 days of the Billing Date taking

into account historical collection rates, contractual limitations and other factors that affect the collectability of Eligible Receivables.

**"Borrowing Certificate"** shall mean a Borrowing Certificate substantially in the form of Exhibit A.

**"Business Day"** shall mean any day other than a Saturday, Sunday or other day on which the Federal Reserve or Lender is closed.

**"Capital Expenditures"** shall mean, for any period, the sum (without duplication) of all expenditures (whether paid in cash or accrued as liabilities) during such period that are or should be treated as capital expenditures under GAAP.

**"Capital Lease"** shall mean, as to any Person, a lease or any interest in any kind of property or asset by that Person as lessee that is, should be or should have been recorded as a "capital lease" in accordance with GAAP.

**"Capitalized Lease Obligations"** shall mean all obligations of any Person under Capital Leases, in each case, taken at the amount thereof accounted for as a liability in accordance with GAAP.

**"Change of Control"** shall mean, with respect to any Borrower or Guarantor, (a) the occurrence of a merger, consolidation, reorganization, recapitalization or share or interest exchange, sale or transfer or any other transaction or series of transactions as a result of which the current owners, directly or indirectly, of a majority of the Borrower's voting stock or voting power cease to be entitled to elect or appoint at least a majority of the Borrower's Board of Directors, or (b) the resignation, termination, replacement, death, disability or any other event the result of which is the failure of the existing senior management of Borrower ceasing to function in their current capacities, unless replacements reasonably acceptable to Lender in its sole discretion are identified and engaged by Borrower prior to such resignation, termination or replacement or within 20 days following any such death or disability.

**"Charter Documents"** shall mean (i) a copy of the certificate of incorporation or formation (or other charter document) and a copy of the bylaws or similar organizational documents of Borrower certified as of a date satisfactory to Lender before the Closing Date by the corporate secretary or assistant secretary of the Borrower, and (ii) copies of the resolutions of the Board of Directors or managers (or other applicable governing body) and, if required, stockholders, members or other equity owners authorizing the execution, delivery and performance of the Loan Documents to which the Borrower is a party, certified by an authorized officer of Borrower as of the Closing Date.

**"Closing"** shall mean the satisfaction, or written waiver by Lender, of all of the conditions precedent set forth in the Agreement required to be satisfied prior to the consummation of the transactions contemplated hereby.

**"Closing Date"** shall mean the date the Closing occurs.

**"Collateral"** shall mean, collectively and each individually, all collateral and/or security granted to Lender by Borrower and/or Guarantors pursuant to the Loan Documents.

**"Collateral Management Fee"** shall have the meaning assigned to the term in Section 3.3.

**"Concentration Account"** shall have the meaning assigned to the term in Section 2.5.

**"Debtor Relief Law"** shall mean, collectively, the Bankruptcy Code of the United States of America and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws from time to time in effect affecting the rights of creditors generally, as amended from time to time.

**"Default"** shall mean any event, fact, circumstance or condition that, with the giving of applicable notice or passage of time or both, would constitute or be or result in an Event of Default.

**"Default Rate"** shall have the meaning assigned to the term in Section 3.7.

**"Deposit Account"** shall mean, collectively, the Lockbox Accounts.

**"Distribution"** shall mean any fee, payment, bonus or other remuneration of any kind, and any repayment of or debt service on loans or other indebtedness.

**"Eligible Billed Receivables"** shall mean each Healthcare Receivable (other than Eligible Unbilled Receivables) arising in the ordinary course of Borrower's business, which Lender, in its sole discretion, deems an Eligible Billed Receivable unless:

    a. it is not subject to a valid perfected first priority security interest in favor of Lender, subject to no other Lien (other than Permitted Liens);

    b. it is not evidenced by an invoice, statement, electronic submission or other documentary evidence satisfactory to Lender; provided, that Lender in its sole discretion may from time to time include Accounts that are not evidenced by an invoice, statement or other documentary evidence satisfactory to Lender as Eligible Billed Receivables and determine the advance rate, liquidity factors and reserves applicable to Advances made on any such Accounts.

    c. it or any portion thereof (in which case only such portion shall not be an Eligible Receivable) is payable by a beneficiary, recipient or subscriber individually and not directly by a Medicaid/Medicare Account Debtor or commercial medical insurance carrier acceptable to Lender;

    d. it arises out of services rendered or a sale made to, or out of any other transactions between Borrower or any of its Subsidiaries and, one or more Affiliates of Borrower or any of its Subsidiaries;

4

e.  it remains unpaid for longer than 150 calendar days after the Billing Date of such Healthcare Receivable;

f.  with respect to all Healthcare Receivables owed by any particular Account Debtor and/or its Affiliates (except Medicaid/Medicare Account Debtor), if more than fifty percent (50%) of the aggregate balance of all such Healthcare Receivables owing from such Account Debtor and/or its Affiliates remain unpaid for longer than 150 calendar days after the Billing Date;

g.  with respect to all Healthcare Receivables owed by any particular Account Debtor and/or its Affiliates (except Medicaid/Medicare Account Debtors), twenty five percent (25%) or more of all such Healthcare Receivables are not deemed Eligible Receivables for any reason hereunder (which percentage may in Lender's sole discretion, be increased or decreased);

h.  with respect to all Healthcare Receivables owed by any particular Account Debtors and/or its Affiliates (except Medicaid/Medicare Account Debtors), if such Healthcare Receivables exceed thirty percent (30%) of the net collectible dollar value of all Eligible Billed Receivables at any one time (including Healthcare Receivables from Medicaid/Medicare Account Debtors) (which percentage may, in Lender's sole discretion, be increased or decreased);

i.  any covenant, agreement, representation or warranty contained in any Loan Document with respect to such Healthcare Receivables has been breached and remains uncured;

j.  the Account Debtor for such Healthcare Receivables has commenced a voluntary case under any Debtor Relief Law or has made an assignment for the benefit of creditors, or a decree or order for relief has been entered by a court having jurisdiction in respect of such Account Debtor in an involuntary case under any Debtor Relief Law, or any other petition or application for relief under any Debtor Relief Law has been filed against such Account Debtor, or such Account Debtor has failed, suspended business, ceased to be solvent, called a meeting of its creditors, or has consented to or suffered a receiver, trustee, liquidator or custodian to be appointed for it or for all or a significant portion of its assets or affairs;

k.  it arises from the sale of property or services rendered to one or more Account Debtors outside the continental United States or that have their principal place of business or chief executive offices outside the continental United States;

l.  it represents the sale of goods or rendering of services to an Account Debtor on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment or any other repurchase or return basis or is evidenced by Chattel Paper or an Instrument of any kind or has been reduced to judgment;

m.  the applicable Account Debtor for such Healthcare Receivables is any Governmental Authority, unless rights to payment of such Account have been

5

assigned to Lender pursuant to the Assignment of Claims Act of 1940, as amended (31 U.S.C. Section 3727, et seq. and 41 U.S.C. Section 15, et seq.), or otherwise all applicable statutes or regulations respecting the assignment of government Accounts have been complied with (for example, with respect to all Accounts payable directly by Medicaid/Medicare Account Debtors);

n.  to the extent that it is subject to any offset, credit (including any resource or other income credit or offset) deduction, defense, discount, chargeback, freight claim, allowance, adjustment, dispute or counterclaim, or is contingent in any respect or for any reason;

o.  there is any agreement with an Account Debtor for any deduction from such Healthcare Receivables, except for discounts or allowances made in the ordinary course of business for prompt payment, all of which discounts or allowances are reflected in the calculation of the face value of each invoice relate thereto, such that only the discounted amount of such Healthcare Receivables after giving effect to such discounts and allowances shall be considered an Eligible Billed Receivable;

p.  any return, rejection or repossession of goods or services related to it has occurred;

q.  it is not payable to Borrower;

r.  Borrower has agreed to accept or has accepted any non-cash payment for such Account;

s.  with respect to any Healthcare Receivables arising from the sale of goods, the goods have not been shipped to the Account Debtor or its designee;

t.  with respect to any Healthcare Receivables arising from the performance of Services, the Services have not been actually performed or the Services were undertaken in violation of any law; or

u.  such Healthcare Receivables fails to meet such other specifications and requirements other than as set forth above, which may from time to time be established by Lender or is not otherwise satisfactory to Lender, as determined in Lender's sole discretion.

"**Eligible Receivables**" shall mean Eligible Billed Receivable and Eligible Unbilled Receivables.

"**Eligible Unbilled Receivables**" shall mean each Healthcare Receivable meeting the criteria of Eligible Billed Receivable, except:

a.    clause (b) shall not apply;

6

b.      clause (e) shall be restated as follows: "remains unbilled for longer than the fifteenth (15th) day of the month following the month in which the services were rendered, unless Borrower notifies Lender that there exists special circumstances with respect to such Account which necessitate a longer period, in which case such Healthcare Receivables shall be ineligible to the extent it remains unbilled for longer than the thirtieth (30th) day of the month following the month in which the services were rendered;"

c.      clause (f) shall be restated as follows: "with respect to all Healthcare Receivables owed by any particular Account Debtor and/or its Affiliates if more than 15% of the aggregate balance of all such Healthcare Receivables owing from such Account Debtor or its Affiliates remains unbilled for longer than the fifteenth (15th) day of the month following the month in which the services were rendered, unless Borrower notifies Lender that there exists special circumstances with respect to such Healthcare Receivables which necessitate a longer period, in which case such Healthcare Receivables shall be ineligible to the extent they remain unbilled for longer than the thirtieth (30th) day of the month following the month in which the services were rendered; and

d.      the eligible unbilled portion of any such Healthcare Receivables shall include, with respect to each Government Contract, revenue earned on each day prior to issuance of any invoice in an amount equal to the amount of revenue under such Government Contract in the month most recently closed on Borrower's accounting system or, in the case of a Government Contract that is in the first month of its term, the estimated amount of revenue for such month, in each case divided by 30, provided that, Lender in its Permitted Discretion may from time to time determine the liquidity factors and reserves applicable to Advances made on any such Healthcare Receivables.

**"Environmental Laws"** shall mean, collectively and each individually, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Superfund Amendment and Reauthorization Act of 1986, the Resource Conservation and Recovery Act, the Toxic Substances Control Act, the Clean Air Act, the Clean Water Act, any other "Superfund" or "Superlien" law and all other federal, state and local and foreign environmental, land use, zoning, health, chemical use, safety and sanitation laws, statutes, ordinances and codes relating to the protection of the environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances, in each case, as amended, and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of Governmental Authorities with respect thereto.

**"ERISA"** shall mean the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

**"Event of Default"** shall mean the occurrence of any event set forth in Article VIII.

**"Facility Cap"** shall have the meaning set forth in the recitals to this Agreement.

7

**"Facility Fee"** shall have the meaning set forth in Section 3.1.

**"Fair Valuation"** shall mean the determination of the value of the consolidated assets of a Person on the basis of the amount which may be realized by a willing seller within a reasonable time through collection or sale of such assets at market value on a ongoing concern basis to an interested buyer who is willing to purchase under ordinary selling conditions in an arm's length transaction.

**"GAAP"** shall mean generally accepted accounting principles in the United States of America in effect from time to time as applied by nationally recognized accounting firms.

**"Government Account"** shall be defined to mean all Accounts arising out of or with respect to any Government Contract.

**"Government Contract"** shall be defined to mean all contracts with the United States government or with any agency thereof, and all amendments thereto.

**"Governmental Authority"** shall mean any federal, state, municipal, national, local or other governmental department, court, commission, board, bureau, agency or instrumentally or political subdivision thereof, or any entity or officer exercising executive, legislative or judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case, whether of the United States or a state, territory or possession thereof, a foreign sovereign entity or country or jurisdiction or the District of Columbia.

**"Government Receivable"** means any Healthcare Receivable which is the obligation of the United States of America, or any State or Territory of the United States of America, and the District of Columbia, or any of their respective agencies, whether under the Medicaid or Medicare program established pursuant to the Social Security Act or any other federal healthcare program, including, without limitation, TRICARE (formerly known as CHAMPUS) and CHAMPVA and whether or not the Healthcare Receivable is the primary obligation of such government or agency.

**"Guarantor"** shall mean Jeffrey Morse, the sole shareholder of the Borrower, and any other guarantor of the Obligations or any part thereof.

**"Guaranty"** shall mean, collectively and each individually, all guarantees executed by any Guarantor.

**"Hazardous Substances"** shall mean, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, hazardous wastes, hazardous or toxic substances or related materials as defined in or subject to any applicable Environmental Law.

**"Healthcare Laws"** shall mean all applicable statutes, laws, ordinances, rules and regulations of any Governmental Authority with respect to regulatory matters primarily relating to patient healthcare, healthcare providers and healthcare services (including

8

without limitation Section 1128(b) of the Social Security Act, as amended, 42 U.S.C. Section 1320a-7(b) (Criminal Penalties Involving Medicare or State Health Care Programs), commonly referred to as the "Federal Anti-Kickback Statute," and the Social Security Act, as amended, Section 1877, 42 U.S.C. Section 1395nn (Prohibition Against Certain Referrals), commonly referred to as "Stark Statute").

**"Healthcare Receivables"** shall mean all (i) accounts, healthcare receivables and payment intangibles, each as defined in the Uniform Commercial Code, and (ii) any and all other accounts receivable or other rights of payment or reimbursement, whenever due, that arose out of, or will arise out of, the rendering whether before or after the date of this Agreement of healthcare services of any kind whatsoever, including without limitation, the services of licensed physicians, nurses or other licensed or unlicensed healthcare personnel, the provision of room, board and daily living assistance at licensed healthcare facilities, home care services, transportation to or from healthcare facilities, or the sale, assignment, lease or license whether before or after the date of this Agreement of healthcare related equipment, prosthetics, pharmaceuticals or other goods, and including, without limitation, all of Borrower's rights of payment or reimbursement with respect to such healthcare services or goods from any insurer, federal or state government agency or other third party; whether billed on a fee for service, monthly per patient capitation charge or any other basis, whether or not the accounts, healthcare insurance receivables, payment intangibles, or rights of payment or reimbursement have been invoiced or billed, written off, partially paid, currently assigned to collection agencies or other third party service vendors.

**"Indebtedness"** of any Person shall mean, without duplication, (a) indebtedness for borrowed money and Capitalized Lease Obligations, (b) all indebtedness secured by any mortgage, pledge, security, Lien or conditional sale or other title retention agreement to which any property or asset owned or held by such Person is subject, whether or not the indebtedness secured thereby shall have been assumed, (c) all indebtedness of others which such Person has directly or indirectly guaranteed, endorsed (otherwise than for collection or deposit in the ordinary course of business), discounted or sold with recourse or agreed (contingently or otherwise) to purchase or repurchase or otherwise acquire, or in respect of which such Person has agreed to supply or advance funds (whether by way of loan, stock, equity or other ownership interest purchase, capital contribution or otherwise) or otherwise to become directly or indirectly liable.

**"Indemnified Persons"** shall have the meaning assigned to the term in <u>Section 12.4</u>.

**"Initial Advance"** shall have the meaning assigned to the term in <u>Section 4.1</u>.

**"Insurer"** shall mean a Person that insures another Person against any costs incurred in the receipt by such other Person or Services, or that has an agreement with any Borrower to compensate it for providing Services to such Person.

**"Landlord Waiver and Consent"** shall mean a waiver/consent in form and substance reasonable satisfactory to Lender from the owner/lessor of any premises not owned by Borrower at which any of the Collateral is now or hereafter located for the purpose of

providing Lender access to such Collateral, in each case as such may be modified, amended or supplemented from time to time.

**"Liability Event"** shall mean any event, fact, condition or circumstance or series thereof (i) in or for which any Borrower becomes liable or otherwise responsible for any amount owed or owing to any Medicaid or Medicare program by a provider under common ownership with such Borrower or any provider owned by such Borrower pursuant to any applicable law, ordinance, rule, decree, order or regulation of any Governmental Authority after the failure of any such provider to pay any such amount when owed or owing, (ii) in which Medicaid or Medicare payments to any Borrower are lawfully set-off against payments to such or any other Borrower to satisfy any liability of or for any amounts owed or owing to any Medicaid or Medicare program by a provider, under common ownership with such Borrower or any provider owned by such Borrower pursuant to any applicable law, ordinance, rule, decree, order or regulation of any Governmental Authority, or (iii) any of the foregoing under clauses (i) or (ii) in each case pursuant to statutory or regulatory provisions that are similar to any applicable law, ordinance, rule, decree, order or regulation of any Governmental Authority referenced in clauses (i) and (ii) above or successor provisions thereto. Notwithstanding the foregoing, a "Liability Event" shall not exist unless it would reasonably be expected to have a Material Adverse Effect.

**"Lien"** shall mean any mortgage, pledge, security interest, encumbrance, restriction, lien or charge of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement or any lease in the nature thereof), or any other arrangement pursuant to which title to the property is retained by or vested in some other Person for security purposes.

**"Loan"** or **"Loans"** shall mean, individually and collectively, all Advances under the Revolving Facility.

**"Loan Documents"** shall mean, collectively and each individually, this Agreement, the Revolving Notes, the Term Note, the Security Documents, the Guaranties and any documents evidencing a security interest in assets as collateral for the Guaranties, the Lockbox Agreements, the Uniform Commercial Code Financing Statements, the Subordination Agreements, the Landlord Waiver and Consents, the Borrowing Certificates, and all other agreements, documents, instruments and certificates heretofore or hereafter executed or delivered to Lender in connection with any of the foregoing or the Loans, as the same may be amended, modified or supplemented from time to time; all of which shall be in form and substance acceptable to Lender in its sole discretion.

**"Lockbox Accounts"** shall mean the accounts maintained by Borrower at the Lockbox Banks into which all collections or payments on their Accounts and Collateral are paid.

**"Lockbox Agreement"** shall have the meaning assigned to the term in <u>Section 2.5</u>.

**"Lockbox Bank"** shall have the meaning assigned to the term in <u>Section 2.5</u>.

**"Management Agreement"** shall mean any agreement between the Borrower and an Affiliate of the Borrower pursuant to which such Affiliate is compensated for providing any management services of any nature to Borrower.

**"Material Adverse Effect"** or **"Material Adverse Change"** shall mean any event, condition or circumstance or set of events, conditions or circumstances or any change(s) which (i) has been or is material and adverse to the value of any of the Collateral or to the business, operations, properties, assets, liabilities or condition of Borrower and Guarantors, taken as a whole, or (ii) did or does materially impair the ability of any Borrower or Guarantor to pay the Obligations or to consummate the transactions under the Loan Documents executed by such Person.

**"Maturity Date"** shall have the meaning assigned to such term in Section 2.2(b).

**"Medicaid/Medicare Account Debtor"** shall mean any Account Debtor which is (i) the United States of America acting under the Medicaid or Medicare program established pursuant to the Social Security Act or any other federal healthcare program, including, without limitation, TRICARE and CHAMPVA, (ii) any state or the District of Columbia acting pursuant to a health plan adopted pursuant to Title XIX of the Social Security Act or any other state healthcare program, or (iii) any agent, carrier, administrator or intermediary for any of the foregoing.

**"Minimum Termination Fee"** shall mean (for the time period indicated) the amount equal to (i) four percent (4%) of the Facility Cap if a Revolving Facility Termination of the type described in any of clauses (i) or (ii) of the definition of "Revolving Facility Termination" occurs on or before the first anniversary of the Closing Date, (ii) two percent (2%) of the Facility Cap if a Revolving Facility Termination of the type described in clauses (i) or (ii) of the definition of "Revolving Facility Termination" occurs after the first anniversary of the Closing Date but before the second anniversary of the Closing Date, (iii) one and a half percent (1.5%) of the Facility Cap if a Revolving Facility Termination of the type described any of clauses (i) or (ii) of the definition of "Revolving Facility Termination" occurs on or after the second anniversary of the Closing Date, and (iv) four percent (4%) of the Facility Cap if a Revolving Facility Termination of the type described in clauses (iii) through (vi) of the definition of "Revolving Facility Termination" occurs at any time.

**"Notes"** shall mean, collectively and each individually, the Revolving Note and the Term Note, as the same may be modified, amended or supplemented from time to time.

**"Obligations"** shall mean all present and future obligations, Indebtedness and liabilities of Borrower and/or Guarantors to Lender at any time and from time to time of every kind, nature and description, direct or indirect, secured or unsecured, joint and several, absolute and contingent due or to become due, matured or unmatured, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, under any of the Loan Documents or otherwise, including, without limitation, all applicable fees, charges and expenses and/or all amounts paid or advanced by Lender on behalf of or for the benefit of any Borrower and/or Guarantor for any reason at any time, including in each

11

case obligations of performance as well as obligations of payment and interest that accrue after the commencement of any proceeding under any Debtor Relief Law by or against any such Person.

**"Payment Office"** shall mean initially the address set forth beneath Lender's name on the signature page of the Agreement, and thereafter, such other office of Lender, if any, which it may designate by notice to Borrower to be the Payment Office.

**"Permit"** shall mean collectively all licenses, leases, powers, permits, franchises, certificates, authorizations, approvals, certificates of need, provider numbers and other rights.

**"Permitted Discretion"** shall mean a determination or judgment made by Lender in good faith in the exercise of its business judgment.

**"Permitted Indebtedness"** shall have the meaning assigned to the term in Section 7.2.

**"Permitted Liens"** shall have the meaning assigned in Section 7.3.

**"Person"** shall mean an individual, a partnership, a corporation, a limited liability company, a business trust, a joint stock company, a trust, an unincorporated association, a joint venture, a Governmental Authority or any other entity of whatever nature.

**"Prime Rate"** shall mean a fluctuating interest rate per annum equal at all times to the rate of interest announced publicly from time to time by JPMorgan Chase Bank, N.A. as its base rate, but in no event less than 8.25% per annum; provided, that such rate is not necessarily the best rate offered to its customers, and, should Lender be unable to determine such rate, such other indication of the prevailing prime rate of interest as may reasonably be chosen by Lender; provided, that each change in the fluctuating interest rate shall take effect simultaneously with the corresponding change in the Prime Rate.

**"Receipt"** shall have the meaning assigned in Section 12.5.

**"Related Property"** shall mean, with respect to each Account, the following: (i) all records of any nature evidencing or related to the Account, including contracts, invoices, charges slips, credit memoranda, notes and other instruments and other documents, books, records and other information (including, without limitation, computer data) (ii) all security interests or liens and property subject thereto from time to time purporting to secure payment of such Account, whether pursuant to the contract related to such Account or otherwise, including all rights of stoppage in transit, replevin, reclamation, supporting obligations and letter of credit rights (as such terms are defined in the Uniform Commercial Code), and all claims of lien filed or held by the Borrower on personal property; (iii) all rights to any goods whose sale gave rise to such Account, including returned or repossessed goods; (iv) all instruments, documents, chattel paper and general intangibles (each as defined in the Uniform Commercial Code) arising from, related to or evidencing such Account; (v) all UCC financing statements covering any collateral securing payment of such Account; (vi) all guaranties and other agreements or arrangements of whatever character from time to time supporting or securing payment of

such Account whether pursuant to the contract related to such Account or otherwise; and (vii) all proceeds and amounts received or receivable arising from any of the foregoing.

"**Revolving Facility Termination**" shall mean any of the following:

(i) Borrower terminates the Revolving Facility under Section 11.1 hereof,

(ii) any other voluntary or involuntary prepayment of the Revolving Facility and/or Obligations relating to the Revolving Facility by Borrower or any other Person occurs (other than reductions to zero of the outstanding balance of the Revolving Facility resulting from the ordinary course operation of the provisions of Section 2.5), whether by virtue of Lender's exercising its right of set-off or otherwise,

(iii) Lender demands or Borrower is otherwise required to make payment in full of the Revolving Facility and/or Obligations relating to the Revolving Facility upon the occurrence of an Event of Default,

(iv) there shall occur any of the following events to the extent that either (a) any such event results in the payments in full of the Obligations (other than indemnity obligations with respect to which no claim has been made) and Lender is not the primary Lender of Borrower or any successor entity resulting therefrom or (b) Lender opts not to continue as Lender under this Agreement as a result of such event:

(x) a Change of Control,

(y) a direct or indirect sale, transfer or other conveyance or disposition, in any single transaction or series of transactions, of greater than 50% of the value of Borrower's assets taken as a whole as reflected in Borrower's most recent financial statements delivered to Lender in accordance with this Agreement, or

(z) any "change in/of control" or "sale" or "disposition" or similar event as defined in any document governing indebtedness of Borrower which gives the holder of such indebtedness the right to accelerate or otherwise require payment of such indebtedness prior to the maturity date thereof,

(v) Lender accelerates the Revolving Note or makes any demand on the Revolving Note, or

(vi) any payment reduction or reduction of the outstanding balance of the Revolving Note and/or the Revolving Facility is made during a bankruptcy, reorganization or other proceeding or is made pursuant to any plan of reorganization or liquidation or any Debtor Relief Law.

**"Revolving Note"** shall mean, collectively and each individually, the promissory note(s) payable to the order of Lender executed by Borrower evidencing the Revolving Facility, as the same may be modified, amended or supplemented from time to time.

**"Security Documents"** shall mean the Revolving Note, the Term Note, this Agreement, the Guaranty, the Lockbox Agreements, Uniform Commercial Code Financing Statements and all other documents or instruments necessary to create or perfected the Liens in the Collateral, as such may be modified, amended or supplemented from time to time.

**"Services"** shall mean medical and healthcare services provided by any Person, including, but not limited to, physician services, nurse and therapist services, dental services, hospital services, skilled nursing facility services, comprehensive outpatient rehabilitation services, home healthcare services, residential and out-patient behavioral healthcare services and any other medical and healthcare services which are covered by a policy of insurance issued by an Insurer or by Medicare, Medicaid or any other federal healthcare program, including, without limitation, TRICARE (formerly known as CHAMPUS) and CHAMPVA.

**"Subordination Agreement"** shall mean, collectively and each individually, any subordination agreements to which Lender and other service providers or creditors of the Borrower are a party.

**"Subsidiary"** shall mean (i) as to Borrower, any Person in which more than 50% of all equity, membership, partnership or other ownership interests is owned directly or indirectly by Borrower or one or more of its Subsidiaries, and (ii) as to any other Person, any Person in which more than 50% of all equity, membership, partnership or other ownership interests is owned directly or indirectly by such Person or by one or more of such Person's Subsidiaries.

**"Term"** shall mean the period commencing on the date set forth on the first page hereof and ending on January 1, 2010.

**"Termination Date"** shall have the meaning assigned to the term in <u>Section 11.1</u>.

**"Term Note"** shall mean the Term Promissory Note payable to the order of the Lender executed by Borrower and evidencing the $150,000 or such lesser or additional amount as may be outstanding pursuant to the terms of this Agreement, as the same may be modified, amended or supplemented from time to time.

**"UCC"** shall mean the Uniform Commercial Code as in effect in the State of Mississippi from time to time.

## II.    ADVANCES, PAYMENT AND INTEREST

### 2.1    Advances

(a)    Subject to the provisions of this Agreement, Lender shall make Advances to Borrower under the Revolving Facility from time to time during the Term, provided that, notwithstanding any other provision of this Agreement, the aggregate amount of all Advances at any one time outstanding under the Revolving Facility shall not exceed the lesser of (a) the Facility Cap, and (b) the Availability.  The Revolving Facility is a revolving credit facility, which may be drawn, repaid and redrawn, from time to time as permitted under this Agreement.  Any determination as to whether there is availability within the Borrowing Base for Advances shall be made by Lender in its Permitted Discretion and is final and binding upon Borrower.  Unless otherwise permitted by Lender, each Advance shall be in an amount of at least $1,000.  Subject to the provisions of this Agreement, Borrower may request Advances under the Revolving Facility up to and including the value, in U.S. Dollars, of eighty five percent (85%) of the Borrowing Base minus (i) amounts then outstanding under the Revolving Facility, and (ii) amounts reserved pursuant to this Agreement, if applicable (such calculated amount being referred to herein as the "Availability").  Advances under the Revolving Facility automatically shall be made for the payment of interest on the Revolving Note and other Obligations on the date when due to the extent available and as provided for herein.

(b)    Lender has established the above-referenced advance rate for Availability and, in its Permitted Discretion, may further adjust the Availability and such advance rate by applying percentages (known as "liquidity factors") to Eligible Receivables by payor class based upon Borrower's actual recent collection history for each such payor class (i.e., Medicare, Medicaid, commercial insurance, etc.), reduced, to the extent necessary, to reflect the entitled reimbursement pursuant to any contract or other arrangement between the Borrower and the applicable Account Debtor(s), in a manner consistent with the Lender's underwriting practices and procedures, including without limitation Lender's review and analysis of, among other things, Borrower's historical returns, rebates, discounts, credits and allowances (collectively, the "Dilution Items").  Such liquidity factors and the advance rate for Availability may be adjusted by Lender throughout the Term as warranted by Lender's underwriting practices and procedures in the Permitted Discretion based upon Lender's due diligence and audits.  Also, Lender shall have the right to establish and readjust from time to time, in its Permitted Discretion, reserves (without duplication of other reserves) against the Borrowing Base, which reserves shall have the effect of reducing the amounts otherwise eligible to be disbursed to Borrower under the Revolving Facility pursuant to this Agreement.

(c)    Subject to the provisions of this Agreement, Borrower may request an advance under the Term Note at Closing in an amount no greater than (1) $150,000 or (2) such amount which, when combined with the net proceeds to

15

Borrower from the Initial Advance on the Revolving Facility, equals $800,000. The Term Loan is not a revolving credit facility, and may not be repaid and redrawn from time to time.

(d)      The Facility Cap may be, with the approval of the Lender, increased in increments of $150,000 at such time as the outstanding principal balance on the Revolving Note equals or exceeds 90% of the then-existing Facility Cap.  In the event that the Facility Cap is increased with the consent of Lender, Borrower shall pay to Lender a Facility Fee in an amount equal to two percent (2%) of the amount by which the Facility Cap is increased.

## 2.2     The Notes; Maturity

(a)      All Advances under the Revolving Facility shall be evidenced by the Revolving Note, payable to the order of Lender, duly executed and delivered by Borrower and dated as of the date hereof, evidencing the aggregate indebtedness of Borrower to Lender resulting from Advances under the Revolving Facility, from time to time.  The advance under the Term Loan shall be evidenced by the Term Note, payable to the order of Lender, duly executed and delivered by Borrower and dated as of the date hereof, evidencing the aggregate indebtedness of Borrower to Lender resulting from the advance on the Term Loan.  Lender hereby is authorized, but is not obligated, to enter the amount of each Advance under the Revolving Facility and the amount of each payment or prepayment principal or interest thereon in the appropriate spaces on the reverse of or on an attachment to the Revolving Note.  Lender may account to Borrower from time to time with a statement of Advances under the Revolving Facility and charges and payments made pursuant to this Agreement, and in the absence of manifest error, such accounting rendered by Lender shall be deemed final, binding and conclusive unless Lender is notified by Borrower in writing to the contrary within 30 calendar days of Receipt of such accounting, which notice shall be deemed an objection only to items specifically objected to therein.

(b)      All amounts outstanding under the Revolving Note and other Obligations shall be due and payable in full, if not earlier in accordance with this Agreement, on the earlier of (i) the occurrence of an Event of Default if required pursuant hereto or Lender's demand upon an Event of Default, and (ii) the last day of the Term (such earlier date being the "Maturity Date").  The amounts outstanding on the Term Note shall be due and payable as set forth therein.

## 2.3     Interest

Interest under the Revolving Note shall be payable monthly in arrears on the first day of each calendar month, commencing February 1, 2007, at an amount equal to the Prime Rate plus five percent (5%) per annum on the Borrowing Base, calculated on the basis of a 360-day year and adjusted for the actual number of calendar days elapsed in each interest calculation period.  Interest shall continue until the later of the expiration of the Term, the irrevocable payment in full in cash of the Obligations and termination of this Agreement.  Any accrued but

unpaid interest shall be added to the principal amount outstanding under the Revolving Note on the first Business Day of each month. Interest on the Term Note shall accrue and be payable as provided therein.

### 2.4    Revolving Facility Disbursements; Requirement to Deliver Borrowing Certificate

So long as no Default or Event of Default shall have occurred and be continuing, Borrower may give Lender irrevocable written notice requesting an Advance under the Revolving Facility by delivering to Lender not later than 11:00 a.m. (New York City time) at least two but not more than four Business Days before the proposed borrowing date of such requested Advance (the "Borrowing Date"), a completed Borrowing Certificate and relevant supporting documentation satisfactory to Lender in its Permitted Discretion, which shall (i) specify the proposed Borrowing Date of such Advance which shall be a Business Day, (ii) specify the principal amount of such requested Advance, (iii) certify the matters contained in Section 4.2, and (iv) specify the amount of any Medicare or Medicaid recoupments and/or recoupments of any third-party payor being sought, requested or claimed, or, to Borrower's knowledge, threatened against Borrower or Borrower's Affiliates. Each time a request for an Advance is made, and, in any event and regardless of whether an Advance is being requested, on Tuesday of each week during the Term (and more frequently if Lender shall so request) until the Obligations are indefeasibly paid in cash in full and this Agreement is terminated, Borrower shall deliver to Lender a Borrowing Certificate accompanied by a separate detailed aging and categorizing of Borrower's accounts receivable and such other supporting documentation with respect to the figures and information in the Borrowing Certificate as Lender shall reasonably request from a credit or security perspective or otherwise. On each Borrowing Date, Borrower irrevocably authorizes Lender to disburse the proceeds of the requested Advance to the Borrower's account(s) as set forth on Schedule 2.4, in all cases for credit by the recipient of such proceeds to the Borrower (or to such other account as to which the Borrower shall instruct Lender) via Federal funds wire transfer no later than 4:00 p.m. (New York City time); provided, however, if any amounts are then due to Lender on account of any fees or expense reimbursements due under the Loan Documents at the time such Advance is requested, Lender is authorized (but not required) to reduce the proceeds to Borrower with respect to such Advance by the amount of such fees or expense reimbursements and to retain such amounts as payment of such fees or expense reimbursements. Lender shall charge a processing fee of $150.00 for the first Advance each calendar week and $450.00 for each subsequent Advance during such calendar week.

### 2.5    Revolving Facility Collections; Repayment; Borrowing Availability and Lockbox

Prior to the consummation of the transactions contemplated by this Agreement, the Borrower shall establish and maintain at the Borrower's expense (A) an account (the "Governmental Lockbox Account") with a depository institution satisfactory to the Lender into which all collections in respect of Governmental Receivables shall be deposited and (B) an account (the "Commercial Lockbox Account") with a depository institution satisfactory to the Lender into which all Collections in respect of all other Accounts and Collateral shall be deposited, pursuant to one or more agreements acceptable to Lender in its sole discretion

17

(collectively, the "Lockbox Agreement").  (The Governmental Lockbox Account and the Commercial Lockbox Account are referred to collectively in this Agreement as the "Lockbox Account" and the depository institution(s) in which the Lockbox Account is maintained are referred to as the "Lockbox Bank".)  The Borrower hereby agrees to direct each payor of an Account to remit all payments with respect to such Account for deposit in the Commercial Lockbox Account (other than Medicaid/Medicare Account Debtors which shall be directed to remit all payments with respect to such Receivables for deposit in the Governmental Lockbox Account) by (A) delivering to each such payor a notice containing such instructions and (B) identifying the Commercial Lockbox Account as the "pay to" address on all bills sent to payors of all Accounts other than Governmental Receivables.  The Borrower further agrees not to change such directive to payors without the prior written consent of the Lender.  The Borrower agrees not to terminate the Commercial Lockbox Account.  The Borrower agrees not to terminate the Governmental Lockbox Account without first providing the Lender with written notice at least 30 days prior to the effective date of such termination.  The Lockbox Agreement shall provide that the Lockbox Bank immediately will transfer all funds paid into the Lockbox Accounts into a depository account or accounts owned and maintained by Lender or an Affiliate of Lender at such bank as Lender may communicate to the Lockbox Bank from time to time (the "Concentration Account").  Such instructions with respect to the Commercial Lockbox Account shall be irrevocable.  Such instructions with respect to the Governmental Lockbox Account shall be irrevocable except on 30 days prior written notice to Lender and the Borrower hereby agrees not to change or direct the custodian thereof to modify such sweep order nor to provide any other or additional instructions to the custodian thereof.  In the event the Borrower terminates the Governmental Lockbox Account, changes the sweep order with respect to the Governmental Lockbox Account or the payors receive any instruction whatsoever from or on behalf of the Borrower indicating that Collections with respect to the Accounts should be sent to any location other than the respective Lockbox Account, the Borrower hereby acknowledges and agrees that such actions would be an express violation of this Agreement, would cause irreparable harm to the Lender for which there would be no adequate remedy at law, and agrees and consents to entry of an order by a court of competent jurisdiction granting the Lender specific performance of the terms and provisions of this Agreement as to the Borrower.

        To the extent that any Accounts collections of Borrower or any other cash payments received by Borrower with respect to Accounts are not sent directly to the appropriate Lockbox Account but are received by Borrower or any of its Affiliates, such collections and proceeds shall be held in trust for the benefit of the Lender and immediately remitted (and in any event within one (1) Business Day), in the form received (or, with respect to cash, by check or wire transfer), to the appropriate Lockbox Account for immediate transfer to the Concentration Account.  Borrower acknowledges and agrees that compliance with the terms of this Section 2.5 is an essential term of this Agreement, and that, in addition to and notwithstanding any other rights Lender may have hereunder under any other Loan Document, under applicable law or equity, upon each and every failure by any Borrower or any of the Affiliates to comply with any such terms or any other terms of this Agreement, Lender shall be entitled to assess a non-compliance fee which shall operate to increase the Applicable Rate by five percent (5.0%) per annum during any period of non-compliance, whether or not a Default or an Event of Default occurs or is declared, provided that nothing shall prevent Lender from considering any failure to comply with the terms of this Section 2.5 to be a Default or an Event of Default.  All funds transferred to the Concentration Account for application to the Obligations shall be applied each

Friday (unless Friday is not a Business Day, in which event such application shall occur on the next Business Day) to reduce the Obligations hereunder in the following order of priority: (i) payment of any fees and expense reimbursements due to Lender under the Loan Documents, (ii) any other Obligations of Borrower not included in items (iii) and (iv) below, (iii) to any interest then due and owing, and (iv) to the principal amount outstanding under the Revolving Note. If as the result of collections of Accounts and/or any other cash payments received by Borrower pursuant to this Section 2.5 a credit balance exists with respect to the Concentration Account, such credit balance shall not accrue interest in favor of Borrower, but shall be available to Borrower in accordance with the terms of this Agreement. If applicable, at any time prior to the execution of all or any of the Lockbox Agreements and operation of all or any of the Lockbox Accounts, Borrower and its Affiliates shall direct all collections or proceeds it receives on Accounts or from other Collateral to the account(s) and in the manner specified by Lender in its Permitted Discretion so long as any amounts are outstanding under the Revolving Facility or the Term Loan.

### 2.6    Promise to Pay; Manner of Payment

Borrower promises to pay principal, interest and all other amounts payable hereunder, or under any other Loan Document, without any right of rescission and without any deduction whatsoever, including any deduction for any setoff, counterclaim or recoupments, and notwithstanding any damage to, defects in or destruction of the Collateral or any other event, including obsolescence of any property or improvements. All payments made by Borrower (other than payments automatically paid through Advances under the Revolving Facility as provided herein), shall be made only by wire transfer on the date when due, without offset or deduction for counterclaim, in U.S. Dollars, in immediately available funds to such account as may be indicated in writing by Lender to Borrower from time to time. Any such payment received after 4:00 p.m. (New York City time) on the date when due shall be deemed received on the following Business Day. Whenever any payment hereunder shall be stated to be due or shall become due and payable on a day other than a Business Day, the due date thereof shall be extended to, and such payment shall be made on, the next succeeding Business Day, and such extension of time in such case shall be included in the computation of payment of any interest (at the interest rate then in effect during such extension) and/or fees, as the case may be.

### 2.7    Repayment of Excess Advances

Any balance of Advances under the Revolving Facility outstanding at any time in excess of the lesser of the Facility Cap or the Availability shall be immediately (or, if such overadvance was created as a result of Lender's adjustment of the advance rates for Availability or eligibility criteria, then within five (5) Business Days, unless such adjustment by Lender was the result of any misrepresentation or fraud of the Borrower, in which as there shall be no grace period and any such overadvance shall be immediately due and payable) due and payable by Borrower upon demand, at the Payment Office, whether or not a Default or Event of Default has occurred or is continuing and shall be paid in the manner specified in Section 2.6.

**2.8    Payments by Lender**

Should any amount required to be paid under any Loan Document remain unpaid after it is due and payable and after the expiration of any cure period, if applicable, such amount may be paid by Lender, which payment shall be deemed a request for an Advance under the Revolving Facility as of the date such payment is due, and Borrower irrevocably authorizes disbursements of any such funds to Lender by way of direct payment of the relevant amount, interest or Obligations.  No payment or prepayment of any amount by Lender or any other Person shall entitle any Person to be subrogated to the rights of Lender under any Loan Document unless and until the Obligations have been fully performed and paid irrevocably in cash and this Agreement has been terminated.  Any sums expended by Lender as a result of any Borrower's or any Guarantor's failure to pay, perform or comply with any Loan Document or any of the Obligations may be charged to Borrower's account as an Advance under the Revolving Facility and added to the Obligations.

**2.9    Grant of Security Interest; Collateral**

(a)    To secure the payment and performance of the Obligations, the Borrower hereby grants to Lender a continuing security interest in and Lien upon, and pledges to Lender, all of its right, title and interest in and to the following (collectively and each individually, the "Collateral"):

   (a)    all of the Borrower's present and future accounts, including all Healthcare Receivables, all Related Property of the Healthcare Receivables and all Instruments, Contracts and Chattel Paper relating to or arising out of any of the foregoing;

   (b)    all Deposit Accounts;

   (c)    all Books and Records, whether now owned or hereafter acquired;

   (d)    all other personal property and fixtures of Borrower, including all inventory, equipment, general intangibles (including, without limitation, payment intangibles and software), chattel paper, supporting obligations, investment property, instruments, securities, contract rights, stock in direct and indirect subsidiaries, machinery, deposit accounts, letter-of-credit rights, intellectual property, copyrights, trademarks, patents, and tradestyles; and

   (e)    any and all additions to any of the foregoing, and any and all replacements and proceeds (including insurance proceeds) of any of the foregoing.

(b)    Upon the execution and delivery of this Agreement, and upon the proper filing of the necessary financing statements without any further action, Lender will have a good, valid and perfected first priority Lien and security interest in the Collateral, subject to no transfer or other restrictions or Liens of any kind in favor

of any other Person except for Permitted Liens.  No financing statement relating to any of the Collateral is on file in any public office except those (i) on behalf of Lender, and/or (ii) in connection with Permitted Liens.

**2.10    Collateral Administration**

(a)    All Collateral (except Deposit Accounts) will at all times be kept by Borrower at the locations set forth on Schedule 5.18B hereto and shall not, without concurrent written notice to Lender, be moved therefrom and in any case shall not be moved outside the continental United States.

(b)    Borrower shall keep accurate and complete records of its Accounts and all payments and collections thereon and shall submit such records to Lender on such periodic basis as Lender may request.  After the occurrence and during the continuance of an Event of Default, and upon Lender's request, Borrower shall execute and deliver to Lender formal written assignments of all of its Accounts weekly or daily as Lender may request, including all Accounts created since the date of the last assignment, together with copies of claims, invoices and/or other information related thereto.  To the extent that collections from such assigned accounts exceed the amount of the Obligations, such excess amount shall not accrue interest in favor of Borrower, but shall be available to Borrower upon Borrower's written request.

(c)    Any of Lender's officers, employees, representatives or agents shall have the right, at any time during normal business hours upon reasonable prior notice to Borrower, to verify the validity, amount or any other matter relating to any Accounts of Borrower.  Borrower shall cooperate fully with Lender in an effort to facilitate and promptly conclude such verification.

(d)    Lender shall have the right at all times after the occurrence and during the continuance of an Event of Default to notify (i) Account Debtors owing Accounts to Borrower other than Medicaid/Medicare Account Debtors that their Accounts have been assigned to Lender and to collect such Accounts directly in its own name and to charge collection costs and expenses, including reasonable attorneys' fees, to Borrower, and (ii) Medicaid/Medicare Account Debtors that Borrower has waived any and all defenses and counterclaims it may have or could interpose in any action or procedure brought by Lender to obtain a court order recognizing the collateral assignment or security interest and lien of Lender in and to any Account or other Collateral and that Lender is seeking or may seek to obtain a court order recognizing the collateral assignment or security interest and lien of Lender in and to any Account or Collateral and that Lender is seeking or may seek to obtain a court order recognizing the collateral assignment or security interest and lien of Lender in and to all Accounts and other Collateral payable by Medicaid/Medicare Account Debtors.

(e)    As and when determined by Lender in its Permitted Discretion, Lender shall have the right to perform the searches described in clauses (i) and (ii) below

against Borrower and Guarantors (the results of which are to be consistent with Borrower's representations and warranties under this Agreement), on a quarterly basis at Borrower's reasonable expense, unless an Event of Default has occurred and is continuing in which case such searches shall be conducted as often as Lender deems appropriate, at Borrower's expense:  (i) UCC searches with the Secretary of State and local filing offices of each jurisdiction where Borrower and/or any Guarantors maintains their respective executive offices, a place of business or assets or in which they are organized; and (ii) judgment, federal tax lien and corporate and partnership tax lien searches, in each jurisdiction searched under clause (i) above.

(f)     Borrower (i) shall provide prompt written notice to its current bank to transfer all items, collections and remittances to the Concentration Account, (ii) shall provide prompt written notice to each Account Debtor that Lender has been granted a lien and security interest in, upon and to all Accounts applicable to such Account Debtor and shall direct each Account Debtor to make payments to the appropriate Lockbox Account, and Borrower hereby authorizes Lender, upon any failure to send such notices and directions within ten (10) calendar days after the date of this Agreement (or ten (10) calendar days after the Person becomes an Account Debtor), to send any and all similar notices and directions to such Account Debtors, and (iii) shall do anything further that may be lawfully required by Lender to secure Lender and effectuate the intentions of the Loan Documents. At Lender's request, Borrower shall immediately deliver to Lender all items for which Lender must receive possession to obtain a perfected security interest and all notes, certificates, and documents of title, Chattel Paper, warehouse receipts, Instruments, and any other similar instruments constituting Collateral.

## 2.11   Power of Attorney

Lender is hereby irrevocably made, constituted and appointed the true and lawful attorney for Borrower (without requiring any of them to act as such) with full power of substitution to do the following: (i) upon the occurrence and during the continuance of an Event of Default, endorse the name of the Borrower upon any and all checks, drafts, money orders, and other instruments for the payment of money that are payable to Borrower and constitute collections on its Accounts; (ii) upon the occurrence and during the continuance of Event of Default, execute in the name of Borrower any financing statements, schedules, assignments, instruments, documents, and statements that it is obligated to give Lender under any of the Loan Documents; (iii) upon the occurrence and during the continuance of an Event of Default, do such other and further acts and deeds in the name of Borrower that Lender may reasonably deem necessary or desirable to enforce any Account or other Collateral, (iv) to perfect Lender's security interest or lien in any Collateral, and (v) sign IRS Forms W-9 on behalf of Borrower reflecting Borrower's address as the address of the Lockboxes established pursuant to Section 2.5 and deliver such Forms to third party payors on the Borrower's Accounts.  In addition, if Borrower breaches its obligation hereunder to direct payments of Accounts or the proceeds of any other Collateral to the appropriate Lockbox Account, Lender, as the irrevocably made, constituted and appointed true and lawful attorney for Borrower pursuant to this paragraph, may by the signature or other act of any of Lender's officers or authorized signatories (without

requiring any of them to do so), direct any federal, state or private payor or fiscal intermediary to pay proceeds of Accounts or any other Collateral to the appropriate Lockbox Account.

## III.    FEES AND OTHER CHARGES

### 3.1    Facility Fee

On the Closing Date, Borrower shall pay to Lender two percent (2.0%) of the Facility Cap as a nonrefundable fee.  In addition, on the Closing Date, Borrower shall pay to Lender two percent (2%) of the amounts advanced with respect to the Term Note at Closing as an additional nonrefundable fee.  The fees payable pursuant to this Section 3.1 and the fee payable pursuant to the last sentence of Section 2.1(d) are herein collectively referred to as the "Facility Fee".

### 3.2    [Intentionally Omitted]

### 3.3    Collateral Management Fee

Borrower shall pay Lender as additional interest a monthly collateral management fee (the "Collateral Management Fee") for monitoring and servicing the Revolving Facility, equal to six hundredths of one percent (0.06%) per week calculated on the basis of the average daily balance under the Revolving Facility outstanding during the preceding month.  The Collateral Management Fee shall be payable weekly in arrears as set forth in Section 2.5 commencing with the first day of the first week following the week during which the Initial Advance is made.

### 3.4    Early Termination Fees

Upon a Revolving Facility Termination, Borrower shall pay Lender (in addition to the then outstanding principal, accrued interest and other Obligations (other than indemnity obligations with respect to which no claim has been made) relating to the Revolving Facility pursuant to the terms of this Agreement and any other Loan Documents), as yield maintenance for the loss of bargain and not as a penalty, an amount equal to the applicable Minimum Termination Fee. Notwithstanding any other provision thereof, no Minimum Termination Fee as described above shall be due and payable if (i) Borrower refinances the Obligations with Lender (which, for purposes hereof, shall include Northern Healthcare Capital, LLC and any of its parents, subsidiaries or Affiliates), (ii) this Agreement terminates in accordance with its terms at the end of its Term, or (iii) Borrower terminates this Agreement within 10 days after a default by Lender hereunder, which default by Lender remains uncured as of the date of such termination.

### 3.5    [Intentionally Omitted]

### 3.6    Computation of Fees; Lawful Limits

All fees hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed in each calculation period, as applicable.  In no contingency or event whatsoever, whether by reason of acceleration or otherwise, shall the interest and other charges paid or agreed to be paid to Lender for the use, forbearance or detention of money

hereunder exceed the maximum rate permissible under applicable law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. If, due to any circumstance whatsoever, fulfillment of any provision hereof, at the time performance of such provision shall be due, shall exceed any such limit, then, the obligation to be so fulfilled shall be reduced to such lawful limit, and, if Lender shall have received interest or any other charges of any kind which might be deemed to be interest under applicable law in excess of the maximum lawful rate, then such excess shall be applied first to any unpaid fees and charges hereunder, then to unpaid principal balance owed by Borrower hereunder, and if the then remaining excess interest is greater than the previously unpaid principal balance, Lender shall promptly refund such excess amount to Borrower and the provisions hereof shall be deemed amended to provide for such permissible rate. The terms and provisions of this Section shall control to the extent any other provision of any Loan Document is inconsistent herewith.

### 3.7    Default Rate of Interest

Upon the occurrence and during the continuation of an Event of Default, the Applicable Rate of interest in effect at such time with respect to the Obligations shall be increased by 5.0% per annum (the "Default Rate").

## IV.    CONDITIONS PRECEDENT

### 4.1    Conditions to Initial Advance and Closing

The obligations of Lender to consummate the transactions contemplated herein and to make the initial Advance under the Revolving Facility (the "Initial Advance") and to fund the Term Note are subject to the satisfaction, in the sole judgment of Lender, of the following no later than January 26, 2007, or such later date to which Lender may agree in its sole discretion:

(a)    (i) Borrower shall have delivered to Lender (A) the Loan Documents to which it is a party, each duly executed by an authorized officer of Borrower and any other parties thereto, and (B) a Borrowing Certificate in the form of Exhibit A for the Initial Advance under the Revolving Facility executed by an authorized officer of Borrower, (ii) each Guarantor, if any, shall have delivered to Lender the Loan Documents to which such Guarantor is a party, each duly executed and delivered by such Guarantor or an authorized officer of such Guarantor, as applicable, and the other parties thereto, and (iii) each equity owner of Borrower shall have delivered to Lender a pledge of such equity owner's equity interest in Borrower as security for the payment of the Obligations;

(b)    all in form and substance satisfactory to Lender in its Permitted Discretion, Lender shall have received (i) a report of Uniform Commercial Code financing statement, tax and judgment lien searches performed with respect to each Borrower and Guarantor in each jurisdiction determined by Lender in its Permitted Discretion, and such report shall show no Liens on the Collateral (other than Permitted Liens and Liens that will be terminated within 5 Business Days after the Closing Date) and (ii) each document (including, without limitation, any Uniform Commercial Code financing statement) required by any Loan

24

Documents or under law or requested by Lender to be filed, registered or recorded to create in favor of Lender, a perfected first priority security interest upon the Collateral, including, without limitation, deposit account control agreements with respect to all of Borrower's deposit accounts;

(c)     Lender shall have received (i) the Charter Documents, all in form and substance reasonably acceptable to Lender, (ii) a certificate of the corporate secretary or assistant secretary of each Borrower dated the Closing Date, as to the incumbency and signature of the Persons executing the Loan Documents, in form and substance reasonably acceptable to Lender, and (iii) the written legal opinion of counsel for Borrower and Guarantors, in form and substance satisfactory to Lender and its counsel, addressing the organization of the Borrower and any entities who are Guarantors, the due authorization and execution of the Loan Documents, the absence of conflicts between the Loan Documents and the organizational documents of the Borrower and any entities that are Guarantors, and the legal, valid and binding effect of the Loan Documents;

(d)     Lender shall have received a certificate of the chief financial officer acting in his or her capacity as such and not individually (or, in the absence of a chief financial officer, the chief executive officer acting in such capacity) of each Borrower and Guarantor, in form and substance satisfactory to Lender (each, a "Solvency Certificate"), certifying (i) the solvency of such Person after giving effect to the transactions and the Indebtedness contemplated by the Loan Documents, and (ii) as to such Person's financial resources and ability to meet its obligations and liabilities as they become due, to the effect that as of the Closing Date and the Borrowing Date for the Initial Advance and after giving effect to such transactions and Indebtedness:  (A) the assets of such Person, at a Fair Valuation, exceed the total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities) of such Person, and (B) no unreasonably small capital base with which to engage in its anticipated business exists with respect to such Persons;

(e)     Lender shall have completed examinations, the results of which shall be satisfactory in form and substance to Lender, of the Collateral, the financial statements and the books, records, business, obligations, financial condition and operational state of each Borrower and Guarantor, and each such Person shall have demonstrated to Lender's satisfaction that (i) its operations comply, in all material respects, with all applicable federal, state, foreign and local laws, statutes and regulations, except where the failure to comply would not reasonably be expected to have a Material Adverse Effect (ii) its operations are not the subject of any governmental investigation, evaluation or any remedial action which could reasonably be expected to result in any Material Adverse Effect, and (iii) it has no liability (whether contingent or otherwise) that would reasonably be expected to have a Material Adverse Effect;

(f)     Lender shall have received all fees, charges and expenses payable to Lender on or prior to the Closing Date pursuant to the Loan Documents;

25

(g)    Borrower shall be in compliance with <u>Section 6.5</u>, and Lender shall have received (i) copies of all such insurance policies, and (ii) a copy of the declarations page for such insurance policies confirming that the Lender has been named as sole beneficiary, loss payee or additional insured, as appropriate;

(h)    All corporate and other proceedings, documents, instruments and other legal matters in connection with the transactions contemplated by the Loan Documents (including, but not limited to, those relating to corporate and capital structures of Borrower) shall be satisfactory to Lender;

(i)    Lender shall have received, in form and substance satisfactory to Lender, (i) evidence of the repayment in full and termination of any existing indebtedness and all related documents, agreements and instruments and of all Liens, security interests and Uniform Commercial Code financing statements relating thereto or, in the sole discretion of Lender, such existing indebtedness is (A) expressly subordinated to the Obligations of Borrower hereunder, (B) unsecured, (C) matures subsequent to the Maturity Date, (D) does not require any payment other than interest during the Term, and (E) will receive no payments following an Event of Default under this Agreement, and (ii) release and termination of any and all Liens, security interest and/or Uniform Commercial Code financing statements in, on, against or with respect to any of the Collateral (other than Permitted Liens);

(j)    All payments required under any Management Agreement shall be subordinated to the Obligations of Borrower hereunder;

(k)    (i) No default shall exist pursuant to any of Borrower's obligations under any material contract and Borrower shall be in compliance with all applicable laws in all material respects, in each case except to the extent such failure would not reasonably be expected to have a Material Adverse Effect and (ii) Borrower has no accounts payable or taxes payable that have been outstanding for more than 90 days, or to the extent that such accounts payable or taxes payable exist, Borrower shall provide to Lender written evidence (satisfactory to Lender in its sole discretion) from such account creditors and/or taxing authorities of payment plans with respect thereto;

(l)    Lender shall have completed its legal due diligence examinations of Borrower, the results of which shall be satisfactory in form and substance to Lender, as evidenced by Lender's execution of the Loan Documents;

(m)    Borrower shall have established Lockbox Accounts and Lender shall have received Lockbox Agreements, all in accordance with <u>Section 2.5</u> and the Commercial Lockbox Account shall have been assigned to Lender as security;

(n)    Lender shall have completed a background check of the principals of Borrower and all Guarantors and the results of such background checks are satisfactory to Lender in its sole discretion;

(o)    Borrower shall have provided evidence satisfactory to Lender of Borrower's compliance with the requirements of Section 6.15;

(p)    Since September 30, 2006, no event has occurred which has had or would reasonably be expected to have a Material Adverse Effect;

(q)    Borrower shall have executed and filed IRS Form 8821 with the appropriate office of the Internal Revenue Service; and

(r)    Lender shall have received such other documents, certificates, information or legal opinions as Lender may reasonably request, all in form and substance reasonably satisfactory to Lender.

**4.2    Conditions to Each Advance**

The obligations of Lender to make any Advance (including, without limitation, the Initial Advance) are subject to the satisfaction, in the sole judgment of Lender in the exercise of its Permitted Discretion, of the following additional conditions precedent:

(a)    Borrower shall have delivered to Lender a Borrowing Certificate for the Advance executed by an authorized officer of Borrower, which shall constitute a representation and warranty by Borrower as of the Borrowing Date of such Advance that the conditions contained in this Section 4.2 have been satisfied; provided, however, that any determination as to whether to fund Advances or extensions of credit shall be made by Lender in its Permitted Discretion;

(b)    each of the representations and warranties made by Borrower in or pursuant to this Agreement shall be accurate in all material respects on and as of the date the advance is requested as if made on and as of such date, before and after giving effect such advance; and no Default or Event of Default shall have occurred or be continuing or would exist after giving effect to the Advance under the Revolving Facility on such date;

(c)    immediately after giving effect to the requested Advance, the aggregate outstanding principal amount of Advances under the Revolving Facility shall not exceed either the Availability and the Facility Cap;

(d)    Lender shall have received on or prior to the date of the requested Advance all fees, charges and expenses payable to Lender on or prior to such date pursuant to the Loan Documents;

(e)    there shall not have occurred any Material Adverse Effect; and

(f)    Lender shall have received such other documents, certificates, information or legal opinions as Lender may reasonably request, all in form and substance reasonably satisfactory to Lender.

## V.   REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants as of the date hereof, the Closing Date, and each Borrowing Date as follows:

### 5.1   Organization and Authority

Borrower is a corporation or limited liability company duly organized, validly existing and in good standing under the laws of its state of formation.  Borrower (i) has all requisite corporate power and authority to own its properties and assets and to carry on its business as now being conducted and as contemplated in the Loan Documents, (ii) is duly qualified to do business in every jurisdiction in which failure so to qualify would reasonably be expected to have a Material Adverse Effect, and (iii) has requisite power and authority (A) to execute, deliver and perform the Loan Documents to which it is a party, (B) to borrow hereunder, (C) to consummate the transactions contemplated under the Loan Documents, and (D) to grant the Liens with regard to the Collateral pursuant to the Security Documents to which it is a party.  The Borrower is not an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, or is controlled by such an "investment company."

### 5.2   Loan Documents

The execution, delivery and performance by Borrower of the Loan Documents to which it is a party, and the consummation of the transactions contemplated thereby, (i) have been duly authorized by all requisite action of Borrower and have been duly executed and delivered by or on behalf of Borrower; (ii) do not violate any provisions of (A) applicable law, statute, rule, regulation, ordinance or tariff, (B) any order of any Governmental Authority binding on Borrower or any of their respective properties the effect of which would reasonably be expected to have a Material Adverse Effect, or (C) the certificate of incorporation or bylaws (or any other equivalent governing agreement or document) of Borrower, or any agreement between Borrower and its shareholders, members, partners or equity owners or among any such shareholders, members, partners or equity owners; (iii) are not in conflict with, and do not result in a breach or default of or constitute an Event of Default, or an event, fact, condition, breach, Default or Event of Default under, any indenture, agreement or other instrument to which Borrower is a party, or by which the properties or assets of Borrower are bound, the effect of which would reasonably be expected to have a Material Adverse Effect; (iv) except as set forth therein, will not result in the creation or imposition of any Lien of any nature upon any of the properties or assets of Borrower, and (v) except as set forth on Schedule 5.2, do not require the consent, approval or authorization of, or filing, registration or qualification with, any Governmental Authority or Borrower.  When executed and delivered, each of the Loan Documents to which Borrower is a party will constitute the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms, subject to the effect of any applicable bankruptcy, moratorium, insolvency, reorganization or other similar law affecting the enforceability of creditors' rights generally and to the effect of general principles of equity which may limit the availability of equitable remedies (whether in a proceeding at law or in equity).

28

### 5.3    Subsidiaries, Capitalization and Ownership Interests

As of the date of this Agreement, Borrower has no Subsidiaries other than those Persons listed as Subsidiaries on Schedule 5.3, each of which are either other Borrowers or Guarantors of the Obligations herein.    Schedule 5.3 also states the authorized and issued capitalization of Borrower and each subsidiary, the number and class of equity securities and/or ownership, voting or partnership interests issued and outstanding of Borrower and the record and beneficial owners thereof (including options, warrants and other rights to acquire any of the foregoing).  The ownership or partnership interests of each Borrower that is a limited partnership or a limited liability company are not certificated, the documents relating to such interests do not expressly state that the interests are governed by Article 8 of the Uniform Commercial Code, and the interests are not held in a securities account.  The outstanding equity securities and/or ownership, voting or partnership interests of Borrower have been duly authorized and validly issued and are fully paid and nonassessable, and each Person listed on Schedule 5.3 owns beneficially and of record all of the equity securities and/or ownership, voting or membership interests it is listed as owning free and clear of any Liens other than Liens created by the Security Documents.  Except as listed on Schedule 5.3, Borrower does not own an interest or participates or engages in any joint venture, partnership or similar arrangements with any Persons.

### 5.4    Properties

Borrower (i) is the sole owner and has good, valid and marketable title to, or a valid leasehold interest in, all of its material properties and assets, including the Collateral, whether personal or real, subject to no transfer restrictions or Liens of any kind except for Permitted Liens, and (ii) is in compliance in all material respects with each lease to which it is a party or otherwise bound except for such noncompliance as would not reasonably be expected to have a Material Adverse Effect.  Schedule 5.4 lists all real properties (and their locations) owned or leased by or to Borrower and all leases (including leases of leased real property) covering or with respect to such properties.  Borrower enjoys peaceful and undisturbed possession under all such leases and such leases are all the leases necessary for the operation of such properties and assets, are valid and subsisting and are in full force and effect.

### 5.5    Other Agreements

Except as set forth on Schedule 5.5, Borrower is not (i) a party to any judgment, order or decree or any agreement, document or instrument, or subject to any restriction, which would materially adversely affect its ability to execute and deliver, or perform under, any Loan Document or to pay the Obligations, (ii) in default in the performance, observance or fulfillment of any obligation, covenant or condition contained in any agreement, document or instrument to which it is a party or to which any of its properties or assets are subject, which default, if not remedied within any applicable grace or cure period would reasonably be expected to have a Material Adverse Effect, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both; would constitute or result in a conflict, breach, Default or Event of Default under, any of the foregoing which, if not remedied within any applicable grace or cure period would reasonably be expected to have a Material Adverse Effect; or (iii) a party or subject to any agreement, document or instrument with respect to, or obligation to pay any, service or Management Fee to a third party (other than Affiliates) with respect to, the ownership,

operation, leasing or performance of any of its business or any facility, nor is there any manager with respect to any such facility.

### 5.6    Litigation

Except as set forth on Schedule 5.6, there is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against Borrower that (i) could reasonably be expected to prevent the validity of any of the Loan Documents or the right of Borrower to enter into any Loan Document or to consummate the transactions contemplated thereby or (ii) could reasonably be expected to be or have, either individually or in the aggregate, any Material Adverse Change or Material Adverse Effect. Except as set forth on Schedule 5.6, Borrower is not aware that there is any basis for the foregoing. Borrower is not a party or subject to any order, writ, injunction, judgment or decree of any Governmental Authority that would reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 5.6, there is no action, suit, proceeding or investigation initiated by Borrower currently pending. Except as set forth in Schedule 5.15, Borrower has not any existing accrued and/or unpaid Indebtedness to any Governmental Authority or any other governmental payor.

### 5.7    Hazardous Materials

Except as would not reasonably be expected to have a Material Adverse Effect, Borrower is in compliance in all material respects with all applicable Environmental Laws. Except as would not reasonably be expected to have a Material Adverse Effect, Borrower has not been notified of any action, suit, proceeding or investigation (i) relating in any way to compliance by or liability of Borrower under any Environmental Laws, (ii) which otherwise deals with any Hazardous Substance or any Environmental Law, or (iii) which seeks to suspend, revoke or terminate any license, permit or approval necessary for the generation, handling, storage, treatment or disposal of any Hazardous Substance.

### 5.8    Tax Returns, Governmental Reports

Borrower (i) has filed all material federal, state, foreign (if applicable) and local tax returns and other reports which are required by law to be filed by Borrower, and (ii) has paid all material taxes, assessments, fees and other governmental charges, including, without limitation, payroll and other employment related taxes, in each case that are due and payable, except only for items that Borrower is currently contesting in good faith and that are described on Schedule 5.8.

### 5.9    Financial Statements and Reports

All financial statements relating to Borrower that have been or may hereafter be delivered to Lender by Borrower are accurate and complete in all material respects and have been prepared in accordance with GAAP consistently applied with prior periods. Borrower has no material obligations or liabilities of any kind not disclosed in such financial information or statements, and since the date of the most recent financial statements submitted to Lender, there has not occurred any Material Adverse Change, Material Adverse Effect or Liability Event or, to Borrower's knowledge, any other event or condition that would reasonably be expected to have a Material Adverse Effect or Liability Event.

### 5.10    Compliance with Law

Borrower (i) is in substantial compliance with all laws, statutes, rules, regulations, ordinances and tariffs of any Governmental Authority applicable to Borrower and/or Borrower's business, assets or operations, including, without limitation, ERISA and Healthcare Laws, and (ii) is not in violation of any order of any Governmental Authority or other board or tribunal, except where noncompliance or violation would not reasonably be expected to have a Material Adverse Effect. There is no event, fact, condition or circumstance which, with notice or passage of time, or both, would constitute or result in any noncompliance with, or any violation of, any of the foregoing, in each case except where noncompliance or violation would not reasonably be expected to have a Material Adverse Effect. Borrower has not received any notice that Borrower is not in compliance in any respect with any of the requirements of any of the foregoing. Borrower has (a) not engaged in any Prohibited Transactions as defined in Section 406 of ERISA and Section 4975 of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder, (b) not failed to meet any applicable minimum funding requirements under Section 302 of ERISA in respect of its plans and no such funding requirements have been postponed or delayed, (c) no knowledge of any event or occurrence which would cause the Pension Benefit Guaranty Corporation to institute proceedings under Title IV of ERISA to terminate any of the employee benefit plans, (d) no fiduciary responsibility under ERISA for investments with respect to any plan existing for the benefit of Persons other than its employees or former employees, or (e) not withdrawn, completely or partially, from any multi-employer pension plans so as to incur liability under the MultiEmployer Pension Plan Amendments of 1980. With respect to Borrower, there exists no event described in Section 4043 of ERISA, excluding Subsections 4043(b)(2) and 4043(b)(3) thereof, for which the thirty (30) day notice period contained in 12 C.F.R. § 26153 has not been waived. Borrower has maintained in all material respects all records required to be maintained by the Joint Commission on Accreditation of Healthcare Organizations, the Food and Drug Administration, Drug Enforcement Agency and State Boards of Pharmacy and the federal and state Medicare and Medicaid programs as required by the Healthcare Laws and, to the best knowledge of Borrower, there are no presently existing circumstances which likely would result in material violations of the Healthcare Laws. There is no Liability Event.

### 5.11    Intellectual Property

Except as set forth on Schedule 5.11, Borrower does not own, license or utilize, and is not a party to, any patents, patent applications, registered trademarks, registered trademark applications, registered service marks, registered copyrights, copyright applications, material trade names, proprietary software or licenses of intellectual property (excluding commercially available off-the-shelf software) (collectively, the "Intellectual Property").

### 5.12    Licenses and Permits; Labor

Borrower is in substantial compliance with and has all Permits necessary or required by applicable law or Governmental Authority for the operation of its businesses except where the failure to be in compliance would not reasonably be expected to have a Material Adverse Effect. All of the foregoing is in full force and effect and not in known conflict with the rights of others except where the failure to be in compliance would not reasonably be expected to

31

have a Material Adverse Effect. Borrower is not (i) in breach of or default under the provisions of any of the foregoing, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both, would constitute or result in a conflict, breach, Default or Event of Default under, any of the foregoing which, if not remedied within any applicable grace or cure period would reasonably be expected to have a Material Adverse Effect, (ii) a party to or subject to any agreement, instrument or restriction that is so unusual or burdensome that it might have a Material Adverse Effect, and/or (ii) and has not been, involved in any labor dispute, strike, walkout or union organization which would reasonably be expected to have a Material Adverse Effect.

### 5.13    No Default

There does not exist any Default or Event of Default or any event, fact, condition or circumstance which, with the giving of notice or passage of time or both, would constitute or result in a Default or Event of Default under any material contract or agreement.

### 5.14    Disclosure

No Loan Document nor any other agreement, document, certificate, or statement furnished to Lender by or on behalf of Borrower in connection with the transactions contemplated by the Loan Documents, when taken as a whole contains any untrue statement of material fact or omits to state any fact necessary to make the statements therein not materially misleading in light of current circumstances.

### 5.15    Existing Indebtedness; Investments, Guarantees and Certain Contracts

Except as permitted by the Loan Documents or as otherwise set forth in Schedule 5.15, Borrower (i) has no outstanding Indebtedness, (ii) is not subject or party to any mortgage, note, indenture, indemnity or guarantee of, with respect to or evidencing any Indebtedness of any other Person, or (iii) does not own or hold any equity or long-term debt investments in, and does not have any outstanding advances to or any outstanding guarantees for the obligations of, or any outstanding borrowings from, any Person. Borrower has performed all material obligations required to be performed by Borrower pursuant to or connection with any items listed on Schedule 5.15 and the items permitted by the Loan Documents and there has occurred no breach, Default or Event of Default under any document evidencing any such items or any fact, circumstance, condition or event which, with the giving of notice or passage of time or both, would constitute or result in a breach, Default or Event of Default thereunder.

### 5.16    Agreements with Affiliates

Except as set forth on Schedule 5.16, there are no existing or proposed material agreements, arrangements, understandings or transactions between Borrower and any of Borrower's officers, members, managers, directors stockholders, partners, other interest holders, employees or Affiliates or any members of their respective immediate families.

32

**5.17   Insurance**

Borrower has in full force and effect such insurance policies as are customary in its industry and as may be required pursuant to Section 6.5 hereof. All such insurance policies as in force on the date of this Agreement are listed and described on Schedule 5.17.

**5.18   Names, Location of Offices, Records and Collateral**

During the preceding five years, Borrower has not conducted business under or used any name (whether corporate, partnership or assumed) other than as shown on Schedule 5.18A. Borrower is the sole owner of all of its names listed on Schedule 5.18A, and any and all business done and invoices issued in such names are Borrower's sales, business and invoices. Each trade name of Borrower represents a division or trading style of Borrower. Borrower maintains its places of business and chief executive offices only at the locations set forth on Schedule 5.18B, and all Accounts of Borrower arise, originate and are located, and all of the Collateral and all books and records in connection therewith or in any way relating thereto or evidence the Collateral are located and shall be only, in and at such locations. All of the Collateral is located only in the continental United States.

**5.19   Non-Subordination**

The Obligations are not subordinated in any way to any other obligations of Borrower or to the rights of any other Person.

**5.20   Accounts**

In determining which accounts are Eligible Receivables, Lender may rely on all statements and representations made by Borrower with respect to any Account. Unless otherwise indicated in writing to Lender, each Account of Borrower (i) is genuine and in all respects what it purports to be and is not evidenced by a judgment, (ii) arises out of a completed, bona fide sale and delivery of goods or rendering of Services by Borrower in the ordinary course of business and in accordance with the terms and conditions of all purchase orders, contracts, certifications, participations, certificates of need and other documents relating thereto or forming a part of the contract between Borrower and the Account Debtor, (iii) is for a liquidated amount maturing as stated in a claim or invoice covering such sale of goods or rendering of Services, a copy of which has been furnished or is available to Lender, (iv) if included on a Borrowing Certificate, together with Lender's security interest therein, is not and will not be in the future (by voluntary act or omission by Borrower), subject to any offset, lien, deduction, defense, dispute, counterclaim or other adverse condition, is absolutely owing to Borrower and is not contingent in any respect or for any reason, (v) there are no facts, events or occurrences which in any way impair the validity or enforceability thereof or materially reduce the amount payable thereunder from the face amount of the claim or invoice and statements delivered to Lender with respect thereto, (vi) (A) the Account Debtor thereunder had the capacity to contract at the time any contract or other document giving rise thereto was executed and (B) such Account Debtor is solvent, (vii) subject to subsection (x) below, there are no proceedings or actions which are threatened or pending against any Account Debtors thereunder which might result in any Material Adverse Change in such Account Debtor's financial condition or the collectability

33

thereof, (viii) has been billed and forwarded to the Account Debtor for payment in accordance with applicable laws and is in substantial compliance and conformance with any requisite procedures, requirements and regulations governing payment by such Account Debtor with respect to such Account, and, if due from a Medicaid/Medicare Account Debtors, is properly payable directly to Borrower, (ix) Borrower has obtained and currently has all Permits necessary in the generation thereof except for any failure to obtain a Permit which would not reasonably be expected to have a Material Adverse Effect, and (x) Borrower has disclosed to Lender on each Borrowing Certificate the amount of all Accounts of Borrower for which Medicare is the Account Debtor and for which payment has been denied and subsequently appealed pursuant to the procedure described in the definition of Eligible Receivables hereof, and Borrower is pursuing all available appeals in respects of such Accounts.

### 5.21   Healthcare Law Compliance

Without limiting or being limited by any other provision of any Loan Document, Borrower has timely filed or caused to be filed all material cost and other reports of every kind required by law, agreement or otherwise, if any, for Borrower's activities. Subject to subsection (x) of Section 5.20, there are no material claims, actions or appeals pending before any commission, board or agency or other Governmental Authority, including, without limitation, any intermediary or carrier, the Provider Reimbursement Review Board or the Administrator of the Center for Medicare and Medicaid Services, with respect to any material state or federal Medicare or Medicaid cost reports or material claims filed by Borrower, or any disallowance by any commission, board or agency or other Governmental Authority in connection with any audit of such cost reports. No validation review or program integrity review related to Borrower or the consummation of the transactions contemplated herein or to the Collateral have been conducted by any commission, board or agency or other Governmental Authority in connection with the Medicare or Medicaid programs, and to the knowledge of Borrower, no such reviews are scheduled, pending or threatened against or affecting any of the providers, any of the Collateral or the consummation of the transactions contemplated hereby.

### 5.22   Reliance on Representations; Survival

Borrower makes the representations and warranties contained herein with the knowledge and intention that Lender is relying and will rely thereon. All such representations and warranties will survive the execution and delivery of this Agreement and the making of the Advances under the Revolving Facility  No investigation or inquiry made by or on behalf of Lender nor knowledge by Lender which is in any fashion inconsistent with the representations and warranties contained herein, shall in any way (i) affect or lessen the representations and warranties made and entered into by the Borrower hereunder, or (ii) reduce or in any way affect Lender's rights with respect to a breach of such representations and warranties.

## VI.   AFFIRMATIVE COVENANTS

The Borrower covenants and agrees that, until full performance and satisfaction, and payment in full in cash, of all the Obligations (other than indemnity obligations with respect to which no claim has been made) and termination of this Agreement:

**6.1    Financial Statements, Reports and Other Information**

(a)    Financial Reports. Borrower shall furnish to Lender (i) as soon as available and in any event within one hundred twenty (120) calendar days after the end of each fiscal year of Borrower, annual consolidated and consolidating financial statements of Borrower, including the notes thereto, consisting of a consolidated and consolidating balance sheet at the end of such completed fiscal year and the related consolidated and consolidating statements of income, retained earnings, cash flows and owners' equity for such completed fiscal year, compiled by an accounting firm acceptable to Lender, and, if Borrower's annual revenues exceed $20,000,000, such financial statements shall be audited and certified without qualification by an independent certified public accounting firm satisfactory to Lender and accompanied by related management letters, if available, and (ii) within thirty (30) calendar days after the end of each calendar month, unaudited consolidated and consolidating financial statements of Borrower consisting of a balance sheet and statements of income, retained earnings, cash flows and owners' equity as of the end of such calendar month. All such financial statements shall be prepared in accordance with GAAP consistently applied with prior periods. With each such financial statement, Borrower shall also deliver a certificate of its chief executive officer or chief financial officer stating that (A) such person has reviewed the relevant terms of the Loan Documents and the condition of Borrower, (B) no Default or Event of Default has occurred or is continuing, or, if any of the foregoing has occurred or is continuing, specifying the nature and status and period of existence thereof and the steps taken or proposed to be taken with respect thereto, and (C) Borrower is in compliance with all financial covenants attached as Annex I hereto. Such certificate shall be accompanied by the calculations necessary to show compliance with the financial covenants in a form satisfactory to Lender. Notwithstanding the foregoing, it is understood that the financial statements may not reflect the results of any unexpected cost report adjustments that may be identified on a governmental audit delivered to Borrower subsequent to the delivery of such financial statements.

(b)    Other Materials. Borrower shall furnish to Lender as soon as available, and in any event within fifteen (15) calendar days after the preparation or issuance thereof or at such other time as set forth below: (i) any reports, returns, information, notices and other materials that Borrower shall send to its stockholders, members, partners or other equity owners at any time, (ii) all Medicare and Medicaid cost reports and other document and materials filed by or on behalf of Borrower and any other reports, materials or other information regarding or otherwise relating to Medicaid or Medicare prepared by, for or on behalf of Borrower, (iii) any other reports, materials or other information regarding or otherwise relating to Medicaid or Medicare prepared by, for, or on behalf of, Borrower or any of its Subsidiaries, including, without limitation, (A) copies of licenses and permits required by any applicable federal, state, foreign or local law, statute ordinance or regulation or Governmental Authority for the operation of its business, (B) Medicaid or Medicare provider numbers and

agreements, (C) state surveys pertaining to any healthcare facility operated or owned or leased by Borrower or any of its Affiliates or Subsidiaries, (D) participating agreements relating to medical plans, (iv) within thirty (30) calendar days after the end of each calendar month for such month, (A) a report of the status of all payments, denials and appeals of all Medicaid and/or Medicare Accounts, (B) a sales and collection report (including credits issued) and accounts receivable and accounts payable aging schedule in a form satisfactory to Lender, all such reports showing a reconciliation to the amounts reported in the monthly financial statements, and (C) a report of census and occupancy percentage, (v) promptly upon receipt thereof, copies of any reports submitted to Borrower by its independent accountants in connection with any interim audit of the books of such Person or any of its Affiliates and copies of each management control letter provided by such independent accountants, and (vi) such additional information, documents, statements, reports and other materials as Lender may reasonably request from a credit or security perspective or otherwise from time to time, including, but not limited to, periodic receivable aging reports, dilution analyses, origination reports and default/charge off reports.

(c)    Notices.  Borrower shall promptly, and in any event within five (5) Business Days after Borrower or any officer of Borrower obtains knowledge thereof, notify Lender in writing of (i) any pending litigation, suit, investigation, arbitration, formal dispute resolution proceeding or administrative proceeding brought against or initiated by Borrower or otherwise affecting or involving or relating to Borrower or any of its property or assets to the extent (A) the amount in controversy exceeds Ten Thousand Dollars ($10,000), or (B) to the extent any of the foregoing seeks injunctive relief, (ii) any Default or Event of Default, which notice shall specify the nature and status thereof, the period existence thereof and what action is proposed to be taken with respect thereto, (iii) any other development, event, fact, circumstance or condition that would reasonably be expected to have a Material Adverse Effect, in each case describing the nature and status thereof and the action proposed to be taken with respect thereto, (iv) any notice received by Borrower from any payor of a claim, suit or other action such payor has, claims or has filed against Borrower, (v) any matter(s) affecting the value, enforceability or collectability of any of the Collateral, including without limitation, claims or disputes in the amount of Ten Thousand Dollars ($10,000) or more, singly or in the aggregate, in existence at any one time, (vi) any notice given by Borrower to any other lender of Borrower and shall furnish to Lender a copy of such notice, (vii) receipt of any notice or request from any Governmental Authority or governmental payor regarding any liability or claim of liability outside the ordinary course of business, (viii) receipt of any notice by Borrower regarding termination of any executive manager of any facility owed, operated or leased by Borrower, and/or (ix) if any Account becomes evidenced or secured by an Instrument or Chattel Paper.

(d)    Consents.  Borrower shall obtain and deliver from time to time all required consents, approvals and agreements from such third parties as Lender shall determine are necessary or desirable in its Permitted Discretion (as communicated

36

to Borrower by written notice) for the protection of its Collateral and that are reasonably satisfactory to Lender with respect to the Loan Documents and the transactions contemplated thereby or any of the Collateral, including, without limitation, Landlord Waivers and Consents with respect to leases entered into after the Closing Date (it being understood and agreed that Borrower need not deliver Landlord's Waivers and consents for any locations existing on the Closing Date).

(e)     Operating Budget.  If requested by Lender, Borrower shall furnish to Lender on or prior to the Closing Date and for each fiscal year of Borrower thereafter not more than sixty (60) calendar days preceding the commencement of such fiscal year, consolidated and consolidating month by month projected operating budgets, annual projections, balance sheets and cash flow reports of and for Borrower for such upcoming fiscal year (including an income statement for each month), in each case prepared in accordance with GAAP consistently applied with prior periods.

## 6.2    Payment of Obligation

Borrower shall make full and timely payment in cash of the principal of and interest on the Loans, Advances and all other Obligations when due and payable.

## 6.3    Conduct of Business and Maintenance of Existence and Assets

Borrower shall (i) engage principally in the same or similar lines of business substantially as heretofore conducted, (ii) collect its Accounts in the ordinary course of business, (iii) maintain all of its material properties, assets and equipment used or useful in its business in good repair, working order and condition (normal wear and tear excepted and except as may be disposed of in the ordinary course of business and in accordance with the terms of the Loan Documents and otherwise as determined by Borrower using commercially reasonable business judgment), (iv) from time to time to make all necessary or desirable repairs, renewals and replacements thereof, as determined by Borrower using commercially reasonable business judgment, (v) maintain and keep in full force and effect its existence and all material Permits and qualifications to do business and good standing in each jurisdiction in which the ownership or lease of property or the nature of its business makes such Permits or qualification necessary and in which failure to maintain such Permits or qualification could reasonably be likely to have a Material Adverse Effect; and (vi) remain in good standing and maintain operations in all jurisdictions in which currently located.

## 6.4    Compliance with Legal and Other Obligations

Borrower shall (i) substantially comply with all laws, statutes, rules, regulations, ordinances and tariffs of all Governmental Authorities applicable to it or its business, assets or operations, (ii) pay all taxes, assessments, fees, governmental charges, claims for labor, supplies, rent and all other obligations or liabilities of any kind, except liabilities being contested in good faith and against which adequate reserves have been established, (iii) perform in accordance with its terms each contract, agreement or other arrangement to which it is a party or by which it or

any of the Collateral is bound, except where the failure to comply, pay or perform would not reasonably be expected to have a Material Adverse Effect, (iv) maintain and comply with all Permits necessary to conduct its business, and (v) properly file all Medicaid/Medicare cost reports except where the failure to comply with any of the foregoing provisions of this Section 6.4 would reasonably be expected to have a Material Adverse Effect.

### 6.5   Insurance

Borrower shall (i) keep all of its insurable properties and assets adequately insured in all material respects against losses, damages and hazards as are customarily insured against by businesses engaging in similar activities or owning similar assets or properties and at least the minimum amount required by applicable law, including, without limitation, medical malpractice and professional liability insurance, as applicable; (ii) maintain general public liability insurance at all times against liability on account of damage to persons and property having such limits, deductibles, exclusions and co-insurance and other provisions as are customary for a business engaged in activities similar to those of Borrower; and (iii) maintain insurance under all applicable workers' compensation laws. All of the insurance polices referenced above shall be satisfactory in form and substance to Lender in its Permitted Discretion, and shall not permit alteration, amendment, modification or cancellation without thirty (30) Business Days prior written notice to Lender. Borrower agrees that it shall not alter, amend, modify or cancel its insurance policies without thirty (30) Business Days prior written notice to Lender provided that no such alteration, amendment, modification or cancellation, shall affect compliance with the requirements set forth in the preceding sentence. The insurance policies referenced in clause (i) shall name Lender as loss payee or as an additional insured thereunder.

### 6.6   True Books

Borrower shall (i) keep true, complete and accurate books of record and accounts in accordance with commercially reasonable business practices in which true and correct entries are made of all of its and their dealings and transactions in all material respects; and (ii) set up and maintain on its books such reserves as may be required GAAP with respect to doubtful accounts and all taxes, assessments, charges, levies and claims and with respect to its business, and include such reserves in its quarterly as well as year end financial statements.

### 6.7   Inspection; Period Audits

Borrower shall permit the representatives of Lender, at the expense of Borrower, from time to time during normal business hours, upon reasonable notice but not more than one time in any calendar quarter (provided that upon the occurrence and during the continuance of an Event of Default, there shall be no restrictions on the number of times that Lender may perform the activities described in this Section 6.7 nor shall Lender be required to give prior notice to Borrower), to (i) visit and inspect any of its offices or properties or any other place where Collateral is located to inspect the Collateral and/or to examine or audit all of its books of account, records, reports and other papers, (ii) make copies and extracts therefrom, and (iii) discuss its business, operations, prospects, properties, assets, liabilities, condition and/or Accounts with its officers and independent public accountants (and by this provision such

officers and accountants are authorized to discuss the foregoing). At the completion of the audit, Borrower shall pay Lender an audit fee of $1,100 per auditor per day and Borrower shall reimburse Lender for all audit-related out-of-pocket expenses.

### 6.8    Further Assurances; Post Closing

At Borrower's cost and expense, Borrower shall (i) within five (5) Business Days after Lender's reasonable request, take such further actions, and duly execute and deliver such further agreements, assignments, instructions or documents and do such further acts and things as may be necessary or proper in the reasonable opinion of Lender to carry out more effectively the provisions and purposes of this Agreement and the Loan Documents, and (ii) upon the exercise by Lender or any of its Affiliates of any power, right, privilege or remedy pursuant to any Loan Documents or under applicable law or at equity which requires any consent, approval, registration, qualification or authorization of any Person, including without limitation a Governmental Authority, execute and deliver, or cause the execution and delivery of, all applications, certificates, instruments and other documents that Lender or its Affiliate may be required to obtain for such consent, approval, registration, qualification or authorization.

### 6.9    Payment of Indebtedness

Except as otherwise prescribed in the Loan Documents, Borrower shall pay, discharge or otherwise satisfy at or before maturity (subject to applicable grace periods and, in the case of trade payables, to ordinary course payment practices) all of its material Indebtedness, except when the amount or validity thereof is being contested in good faith by appropriate proceedings and such reserves as required by GAAP shall have been made.

### 6.10    Lien Terminations

If Liens other than Permitted Liens exist, Borrower immediately shall take, execute and deliver all actions, documents and instruments necessary to release and terminate such Liens.

### 6.11    Use of Proceeds

Borrower shall use the proceeds from the Revolving Facility and the Term Note only for the purposes set forth in the first "WHEREAS" clause of this Agreement.

### 6.12    Collateral Documents; Security Interest in Collateral

Pursuant to Section 2.11, Lender has full power of attorney to execute, deliver, file, register and/or record in the name of Borrower and financing statements, schedules, assignments, instruments, and documents necessary to perfect Lender's security interest in or lien on any Collateral.  If necessary or advisable beyond that power of attorney, and at the reasonable request of Lender upon reasonable notice, Borrower shall (i) execute, obtain, deliver, file, register and/or record any and all financing statements, continuation statements, stock powers, instruments and other documents, or cause the execution, filing, registration, recording or deliver of any and all of the foregoing, that are necessary or required under law or otherwise or reasonably requested by Lender to be executed, filed, registered, obtained, delivered or

39

recorded to create, maintain, perfect, preserve, validate or otherwise protect the pledge of the Collateral to Lender and Lender's perfected first priority Lien on the Collateral (and Borrower irrevocably grants Lender the right, at Lender's option, to file any or all of the foregoing) and (ii) defend the Collateral and Lender's perfected first priority Lien thereon against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to Lender, and pay all reasonable costs and expenses (including, without limitation, reasonable in-house documentation and diligence fees and reasonable legal expenses and reasonable attorneys' fees and expenses) in connection with such defense, which may at Lender's discretion be added to the Obligations.

### 6.13    [Intentionally Omitted]

### 6.14    Taxes and Other Charges

All payments and reimbursements to Lender made under any Loan Document shall be free and clear of and without deduction for all taxes, levies, imposts, deductions, assessments, charges or withholdings, and all liabilities with respect thereto of any nature whatsoever, excluding taxes to the extent imposed on Lender's net income. If Borrower shall be required by law to deduct any such amounts from or in respect of any sum payable under any Loan Document to Lender, then the sum payable to Lender shall be increased as may be necessary so that, after making all required deductions, Lender receives an amount equal to the sum it would have received had no such deductions been made. Notwithstanding any other provision of any Loan Document, if at any time after the Closing (i) any change in any existing law, regulation, treaty or directive or in the interpretation or application thereof, (ii) any new law, regulation, treaty or directive (whether or not having the force of law) from any Governmental Authority:  (A) subjects Lender to any tax, levy, impost, deduction, assessment, charge or withholding of any kind whatsoever with respect to any Loan Document, or changes the basis of taxation of payments to Lender of any amount payable thereunder (except for net income taxes, or franchise taxes imposed in lieu of net income taxes, imposed generally by federal, state or local taxing authorities with respect to interest or facility fees or other fees payable hereunder or changes in the rate of tax on the overall net income of Lender), or (B) imposes on Lender any other condition or increased cost in connection with the transactions contemplated thereby or participations therein; and the result of any of the foregoing is to increase the cost to Lender of making or continuing any Loan hereunder or to reduce any amount receivable hereunder, then, in any such case, Borrower shall promptly pay to Lender any additional amounts necessary to compensate Lender, on an after-tax basis, for such additional cost or reduced amount as determined by Lender. If Lender becomes entitled to claim any additional amounts pursuant to this Section 6.14 it shall promptly notify Borrower of the event by reason of which Lender has become so entitled, and each such notice of additional amounts payable pursuant to this Section 6.14 submitted by Lender to Borrower shall, absent manifest error, be final, conclusive and binding for all purposes.

### 6.15    Payroll Agent

Borrower shall comply with the requirements of either item (a) or (b) below:

40